[No. B175291. Second Dist., Div. Eight. Aug. 16, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
PAMELA R. LEE, Defendant and Appellant.

COUNSEL

Law Offices of Tracy Green and Tracy Green for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lawrence M. Daniels and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**FLIER, J.**—Appellant Pamela R. Lee is a retired deputy sheriff who fired her handgun to scare away two unleashed dogs that she encountered while walking her dog. She appeals her conviction for discharge of a firearm with gross negligence, contending that the trial court erred in refusing to instruct on self-defense. Respondent counters that the defense of self-defense does not apply to an attack by an animal, or that if it does apply, there was no substantial evidence to support it here. We hold that the defense of self-defense applies to an attack by an animal and that appellant's testimony provided evidentiary support for the denied instructions. We therefore reverse.

## PROCEDURAL HISTORY

Count 1 of the information charged appellant with gross negligence in the discharge of a firearm, which is a serious felony. Appellant was also charged with attempted cruelty to an animal (count 2), carrying a concealed firearm (count 3), carrying a loaded firearm (count 4), and vandalism (count 5). Counts 2 and 5 were dismissed on motion of the People before appellant's first trial. The jurors at the first trial were instructed on two defenses, necessity and self-defense. They deadlocked on count 1 and found appellant not guilty as to counts 3 and 4.

The second trial on count 1 took place before a different judge and jury. The second jury was instructed on necessity but not on self-defense. It found appellant guilty. A motion for new trial was denied. The sentence was three years of formal probation. One of the probation conditions requires appellant to serve 180 days in jail or, in lieu of jail, to give 180 days of service to Cal-Trans, a tree farm, the Humane Society, or an animal shelter. This appeal followed.

## FACTS

### 1. *Prosecution Evidence*

The prosecution presented testimony from four eyewitnesses, James King, Gregory Landeros, Ingrid Carlson, and Demetrios Sourapas. Its other witnesses were the arresting officer, the man whose car was struck by the bullet from appellant's gun, and a firearms expert.

### A. *James King*

On January 8, 2003, King owned and managed a car repair shop, which was in a strip mall on South Azusa Avenue in West Covina. On the repair shop's north side was a Kentucky Fried Chicken restaurant. On its south side was a real estate office. To its west was a wooded area, which ended with a large concrete wall. On its east side was a parking lot, edged by a grassy embankment, which sloped up about 10 feet to the sidewalk of South Azusa Avenue.

Around 2:30 pm. on January 8, 2003, King was entering a parked car outside of the repair shop when he noticed appellant walking north on the sidewalk of South Azusa Avenue. Appellant had a 100-pound Rottweiler on a leash. She was yelling at two stray dogs that were running around near a parked car in the parking lot beneath her. King estimated that the dogs were 25 feet from appellant, and weighed 25 to 30 pounds each. "[E]very once in a while they would bark at her; [her] dog would bark, she would yell some more." After the yelling and barking continued for several minutes, appellant pulled out a black semiautomatic weapon. She pointed the gun at the dogs for 10 or 15 seconds, yelled at them, and returned the gun to her purse. She turned, took a step north on the sidewalk, turned back towards the dogs, took the weapon out, and pointed it at them again. After repeating this activity three or four times over a two-minute period, she fired the gun once. The bullet entered the hood of a parked car near the dogs. Appellant ran up the sidewalk with her dog. The two stray dogs ran away.

King was very definite that the stray dogs moved back and forth behind the parked car, but never advanced towards appellant. On cross-examination, he admitted that he was looking at an angle, and was too far away to see exactly what appellant did with the gun. He did not recall her exact words, but heard her "screaming at the dogs to run away."

### B. *Gregory Landeros*

Landeros was a customer at the car repair shop who came outside when he "heard the commotion." He saw appellant and the Rottweiler walking north

on the sidewalk, in the direction of two "medium-sized," "knee high" stray dogs in the parking lot below. Appellant was screaming and cursing at the dogs, which ran in circles and played together near a parked car. There were 10 or 15 feet between appellant and the dogs. Landeros heard no barking and saw nothing to suggest that the dogs were about to attack appellant. Three or four times, within the space of a minute, appellant pulled a firearm in and out of a pouch she was wearing. "Then she pointed at the dogs kind of but more towards the gold car and just shot." She walked off briskly with her dog, and the stray dogs ran away.

On cross-examination, Landeros testified that he was 50 to 100 feet from appellant when he made his observations. He could hear exactly what she yelled, which was, "Get the f--- away from me." He was not able to see whether the dogs bared their fangs at appellant, but he thought their mouths were shut.

### C. *Ingrid Carlson*

Carlson was working inside of the real estate office next to the car repair shop. She looked outside when her own dog started to bark at the dogs outside. She saw appellant walking a "lumbering and lethargic" dog on a leash. Appellant was shouting at an unleashed dog, which was a "German shepherd mix." Several times, appellant walked, stopped, walked back, pulled a handgun out, put it away, and resumed walking. Carlson was surprised to see the gun, as businesses were open and there were numerous cars moving through the parking lot. The dog stayed on the pavement, did not go onto the grassy area or approach appellant, and did nothing to suggest it was going to attack her. Finally, appellant shot the gun and ran up the sidewalk. The dog ran away, accompanied by a second unleashed dog, which Carlson observed at that time.

According to Carlson, the stray dog was "10 to 20 feet" from appellant when the shot was fired. At the preliminary hearing, she had described that distance as " 'six to eight feet.' "

### D. *Demetrios Sourapas*

Sourapas was working at the auto shop that day. He saw that appellant was walking a "very big" dog. Shortly after that he saw appellant "being approached by a couple of dogs." The dogs were "moving in her direction." They were "not walking right toward, just in the general direction of the dogs with her dog. Dogs attract dogs." They "looked like curious dogs," and did nothing to suggest they were about to attack. They were small enough to be picked up with one arm, "a little bit bigger than a Chihuahua." They were

"about 20 feet" from appellant, towards the rear passenger side of a parked car in the parking lot. Appellant yelled at the dogs, to no effect. The dogs were barking, but they "pretty much kept their distance," and did not get up on the grassy area. Appellant pulled a handgun in and out of a handbag a few times, and then fired it. The shot scared the dogs away.

On cross-examination, Sourapas testified that when he saw appellant, he was 30 to 40 feet away, just outside of one of the auto bays of the repair shop. He could see the dog's faces but could not see their teeth. They were far from him, but "fairly close" to appellant. He could not hear what appellant was yelling.

### E. *The Arresting Officer*

Officer Joseph Serrano responded to a call about the gunshot. After speaking with Carlson, he located appellant and her dog, running on the sidewalk north of the area. Serrano stopped his patrol car and drew his gun. He ordered appellant to lie on the ground and not reach for her tote bag. Inside of the bag, he found a loaded semiautomatic handgun.

### F. *The Owner of the Car*

Juan Leon was at work inside of the real estate office. His car was parked outside. After the shot was fired, he discovered that a bullet had gone through the hood of his car. The bullet was never found.

### G. *The Prosecution's Firearms Expert*

Don Preston, a West Covina police officer and firearms expert, testified that there were substantial dangers from the firing of the gun while businesses were open and numerous vehicles and people were in the parking lot. He was concerned about where the bullet might go if it missed its target or was deflected by hitting metal or asphalt. Factors to be considered included the area where the gun was discharged, the backstop, whether the intended target was struck with the projectile, the threat that the dogs posed, and the distance to the surrounding buildings. In his opinion, if there was any distance between the weapon and the target, it was necessary to sight the weapon. He recognized, however, that appellant would have received handgun training when she was a sheriff's deputy, and that the closer the attacker was, the less time there was to react.

### 2. *Defense Testimony*

Appellant testified that she was an active deputy with the Los Angeles County Sheriff's Department between 1988 and 1994. After that she retired to

pursue other career opportunities. Before she entered the Sheriff's Academy, she had 40 hours of firearm training while studying for her degree in crime and criminal justice. At the Sheriff's Academy, she had 84 hours of firearm training. As an active deputy, she routinely met qualifying requirements by shooting at the firing range. She also took an additional eight-hour course on the particular handgun she used here. After she left the sheriff's department, she continued to practice with the handgun, as she enjoyed the sport of marksmanship. She thought she was still "a good shot" on January 8, 2003, the date of the incident.

Appellant further explained that she routinely walked her dog along the path she took that day. She had a loaded handgun with her for two reasons: (1) Certain people knew her from the days when she was an undercover officer who purchased narcotics throughout the county. After she retired, her previously sealed personal information became public knowledge. She had once been confronted at a shopping mall by a person whom she had arrested and prosecuted. On another occasion, a man stepped out of some shrubbery when she was taking a walk in her neighborhood. (2) Although her Rottweiler was large, he was old and had severe health problems, so he offered her no personal protection.

Appellant described three occasions in the past when she had problems with unleashed dogs.

In 2000, a neighbor's mixed-breed Chow Chow dog ran up and bit her on the wrist, while she was walking the Rottweiler and a cocker spaniel that she had rescued from a shelter.

In 2001, when she was walking both of the dogs, a "Chow Chow mixed breed dog" broke through the screen of a neighbor's house. It ran up and bit her and both of her dogs. Because she and her dogs became entangled in the leash, the dog was able to "take a nice sizable chunk" from her inner thigh, near her private area. The police came and subdued the dog with pepper spray.

Later in 2001, she was walking the Rottweiler near the Kentucky Fried Chicken restaurant next to the car repair shop. She saw two pit bulls on the sidewalk 100 feet away, in the path she needed to take home. Her gun was with her, but she did not take it out. When the pit bulls started to advance in her direction, she went into the restaurant and called 911. A police officer drove her and the Rottweiler home.

Appellant's version of the present incident differed in important respects from that of the prosecution's eyewitnesses.

According to appellant, the two dogs growled and barked at her. "One was a Rottweiler mix and the other was a German shepherd mix." Their barking was "really rapid and really aggressive and their teeth were seething and their gums were bared and their ears were pointed and they were low and kind of crouched and they were barking and seething at me."[1] She yelled and cursed at the dogs for three to five minutes. They did not leave. Her hand was extended and then was inside of her bag. She could see people at the rear of the building to the right. She yelled for them to help her, but nobody responded. She could not run into the street, due to traffic.

According to appellant, the dogs were "[s]ix to eight feet" away. She was very afraid. They were advancing and retreating and then advancing further as she walked in their direction. She had no time to use her cell phone. Holding her dog's leash in one hand, she used the other to retrieve her gun and take off the safety. While trying to decide whether to shoot, she pulled the gun out several times, pointed it at the dogs, and put it away. From the angle and direction at which she was shooting, she decided it was "very, very unlikely" that she would shoot a person. The realty building was out of her line of fire, off to the left, over 70 feet away. The auto shop was 100 to 180 feet away. In the immediate line of fire, in the far background of the lot, there was a high cement wall.

Appellant believed she "was in immediate, imminent danger." One of the dogs had advanced to a crouching position on the grassy slope between the sidewalk and the parking lot. She thought it was preparing to attack. An attack from that short distance could happen quickly. The dogs had separated, so she could not watch them simultaneously. She thought they were using "pack mentality," circling to attack. To shoot into the air would be dangerous. She recalled an incident in San Francisco when a woman was mauled by a dog. She did not have time to sight her weapon. She fired once at the dog. Then she yelled, and the dogs ran away. She was trotting towards home with her dog when she was stopped at gunpoint by Officer Serrano.

On cross-examination, appellant testified that when she fired, the nearest people were about 180 feet away. She did not panic. She might have told the detectives who later interviewed her that she did not remember firing the gun. She did not tell them that the motorcycle officers looked like spacemen. What she said was that the motorcycle officers looked like storm troopers, as they were not wearing uniforms, and had helmets, which made their faces invisible. About eight men on motorcycles pointed guns at her. Serrano was the only officer who wore a uniform.

---

[1] "Seething" meant that strands of saliva were dripping inside the dogs' mouths.

Appellant also presented testimony from an expert who measured distances at the crime scene. There was a five-foot vertical drop between the sidewalk and the curb area of the parking lot. It was 35 feet from appellant's location to the northeast corner of the building where the real estate office was located. The door of that office was further than that. The distance from the curb to the corner of the auto repair shop was 181 feet. There was 150 feet from the front of the parking lot to the block wall at the far end of the lot.

Appellant also presented testimony from Paxton Quigley, a certified handgun instructor who was an expert on gun safety, handling and training. In her opinion, if danger was imminent, there might not be time to point and shoot. It was important to consider the type and caliber of weapon, the backdrop, the risk to an innocent bystander who was within immediate range, and the distance between the assailant and the shooter. Most law enforcement officers knew of the "Tueller's Drill," which involved evidence that if an attacker with a knife was 21 feet away, he could be at one's side within 1.5 to 2 seconds. Quigley had visited the location with appellant. She thought it was important that the slope was downward, and that the bullet hit a car, which was adjacent to the dogs and was less than 10 feet away. Shooting down at the dogs was different from shooting towards the building.

On cross-examination, Quigley admitted that there was a possibility of injury when a gun was fired, and it might ricochet off the ground or be deflected by metal.

3. *Prosecution Rebuttal Testimony*

Officer Serrano testified that only two other officers were present when he arrested appellant. They arrived on "dirt bike motorcycle[s]" and pulled out their guns. They wore black polo shirts indicating that they were police officers. They had helmets, but did not look like spacemen.

When West Covina Police Officer Neil Hopkins interviewed appellant on the day of the shooting, she told him that the dogs growled, bared their teeth, and moved towards her. The dog that was closest came onto the grass, one foot to the left of the sidewalk, and three feet towards the bottom. She did not remember pulling out the gun or firing it. She said that the two motorcycle officers looked like spacemen. She also said that, following her retirement, she went to the firing range every six months, but had not shot at the "qualification" level, or "scored her targets."

## DISCUSSION

We agree with appellant that the trial court committed reversible error when it refused to instruct on self-defense.

## 1. *The Record*

Appellant was convicted of discharging a firearm with gross negligence, in violation of Penal Code section 246.3.[2] The elements of that crime are set forth in CALJIC No. 9.03.3. The second jury found appellant guilty after receiving a version of CALJIC No. 9.03.3, which stated:

"[Defendant is accused [in Count One] of having violated section 246.3 of the Penal Code.]

"Every person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a violation of Penal Code section 246.3, a crime.

"In order to prove this crime, each of the following elements must be proved:

"1. A person willfully discharged a firearm;

"2. The person who discharged the firearm did so in a grossly negligent manner; and

"3. The discharge of the firearm was done in a manner which could result in injury or death to a person."

In contrast, the jury at the first trial, which deadlocked on the same charge, received a version of CALJIC No. 9.03.3 that included language on self-defense.[3] The instruction that was given at the first trial, shown, *post*, with italicized language that was not given at the second trial, stated:

"[Defendant is accused [in Count[s] I] of having violated section 246.3 of the Penal Code.]

"Every person who willfully *[and unlawfully]* discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a violation of Penal Code section 246.3, a crime.

---

[2] Penal Code section 246.3 states: "Except as otherwise authorized by law, any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense and shall be punished by imprisonment in the county jail not exceeding one year, or by imprisonment in the state prison." The statute was enacted in 1988, "to deter the discharge of firearms on holidays such as New Year's and the Fourth of July." (*People v. Alonzo* (1993) 13 Cal.App.4th 535, 539 [16 Cal.Rptr.2d 656].)

All further code references are to the Penal Code unless otherwise stated.

[3] While the judge at the first trial gave the jury the language on self-defense in CALJIC No. 9.03.3, he refused to give several specific self-defense instructions that the defense requested, CALJIC Nos. 5.30, 5.50, 5.51, and 5.52.

"In order to prove this crime, each of the following elements must be proved:

"1. A person willfully [*and unlawfully*] discharged a firearm;

"2. The person who discharged the firearm did so in a grossly negligent manner; and

"3. The discharge of the firearm was done in a manner which could result in injury or death to a person.

"[*The willful discharge of a firearm is not unlawful when done in lawful* [*self-defense*]. *The People have the burden to prove that the discharge of the firearm was not in lawful* [*self-defense*]. *If you have a reasonable doubt that the discharge of the firearm was unlawful, you must find the defendant not guilty.*]"

The italicized language will be called "the self-defense language of CALJIC No. 9.03.3" in the remainder of this opinion. According to the Use Note to CALJIC No. 9.03.3 (Jan. 2005 ed.) on page 480, it should not be given "[i]f there is no evidence to support self-defense or defense of others."

The juries at both trials were instructed on the defense of necessity through CALJIC No. 4.43, which states:

"A person is not guilty of a crime when [she] engages in an act, otherwise criminal, through necessity. The defendant has the burden of proving by a preponderance of the evidence all of the facts necessary to establish the elements of this defense, namely:

"1. The act charged as criminal was done to prevent a significant and imminent evil, namely, [a threat of bodily harm to oneself or another person];

"2. There was no reasonable legal alternative to the commission of the act;

"3. The reasonably foreseeable harm likely to be caused by the act was not disproportionate to the harm avoided;

"4. The defendant entertained a good-faith belief that [her] act was necessary to prevent the greater harm;

"5. That belief was objectively reasonable under all the circumstances; and

"6. The defendant did not substantially contribute to the creation of the emergency."

When the instructions were discussed, *post*, appellant's counsel, Ms. Green, specifically asked that the self-defense language of CALJIC No. 9.03.3 be given. She also requested CALJIC No. 5.30, which defines self-defense.[4]

The prosecutor, Deputy District Attorney Bean, opposed any instruction on self-defense. He maintained that the cases on self-defense assumed that the assailant was a person, and if the attack was by an animal, the applicable defense was necessity.

Green responded that the CALJIC instructions on self-defense did not say that the attack had to be by a person. She also said she knew of cases in other states which involved attacks by bears.

The judge was concerned that, if it were necessary to instruct on self-defense, there were other self-defense instructions that needed to be given. He agreed with Green that the self-defense instructions in CALJIC did not say that the attacker had to be a person. In his opinion, "common sense and logic suggest that certainly an attack could come at the hand of another through the use of a trained dog, which is an attack dog, right?" He reserved ruling until the next day. Counsel were asked to provide case support for their positions.

The next day, February 18, 2004, Green filed a motion which requested a series of self-defense instructions: CALJIC No. 5.30 (Self-defense), CALJIC No. 5.43 (Force That May Be Used in Defense of Property),[5] CALJIC

---

[4] The rejected version of CALJIC No. 5.30, which the defense requested, stated: "It is lawful for a person who is being attacked to defend herself from attack if, as a reasonable person, she has grounds for believing and does believe that bodily injury is about to be inflicted upon her. In doing so, that person may use all force and means which she believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent."

The defense modifications substituted "attack" and "attacked" for "assault" and "assaulted" in the first sentence, and "her" for "him" elsewhere in the CALJIC instruction.

[5] CALJIC No. 5.43 states: "When conditions are present which, under the law, justify a person in using force in defense of property, that person may use that degree and extent of force as would appear to a reasonable person, placed in the same position, and seeing and knowing what the resisting person then sees and knows, to be reasonably necessary to prevent imminent injury threatened to the property. Any use of force beyond that limit is excessive and unjustified, and anyone using excessive force is legally responsible for the consequences thereof."

No. 5.50 (Assailed Person Need Not Retreat),[6] CALJIC No. 5.51 (Self-defense, Actual Danger Not Necessary),[7] and CALJIC No. 5.52 (Self-defense—When Danger Ceases).[8] The motion stated that there were no cases which specifically addressed the issue, but instructing solely on necessity would improperly shift the burden of proof to the defendant.

At the February 18 proceedings, the problem was discussed at length.[9] The judge complained that Green had cited no cases. She responded that the People also had no case support. The judge had carefully reviewed the CALJIC self-defense instructions. He said they all involved "another person attacking the person who is attempting to justify the use of force. Doesn't relate to dogs." In his opinion, the CALJIC committee had not considered an attack by a dog. He decided to instruct on necessity and not on self-defense, as "a dog is not a person within the meaning of those sections that deal with self-defense."

In his final argument to the jury, Bean argued that the testimony by the People's witnesses showed that the dogs were not about to attack. Therefore, appellant acted unreasonably when she fired down into the parking lot, knowing that there were people there. For some reason, appellant "wasn't acting rationally and reasonably" or "wasn't thinking right that day."

Green's argument for the defense focused on appellant's version of the events. She argued that wild, unleashed dogs were dangerous. Appellant had extensive firearms training and a good reason to be carrying a gun. The

---

[6] CALJIC No. 5.50 states: "A person threatened with an attack that justifies the exercise of the right of self-defense need not retreat. In the exercise of [his] [her] right of self-defense a person may stand [his] [her] ground and defend [himself] [herself] by the use of all force and means which would appear to be necessary to a reasonable person in a similar situation and with similar knowledge; and a person may pursue [his] [her] assailant until [he] [she] has secured [himself] [herself] from danger if that course likewise appears reasonably necessary. This law applies even though the assailed person might more easily have gained safety by flight or by withdrawing from the scene."

[7] CALJIC No. 5.51 states: "Actual danger is not necessary to justify self-defense. If one is confronted by the appearance of danger which arouses in [his] [her] mind, as a reasonable person, an actual belief and fear that [he] [she] is about to suffer bodily injury, and if a reasonable person in a like situation, seeing and knowing the same facts, would be justified in believing [himself] [herself] in like danger, and if that individual so confronted acts in self-defense upon these appearances and from that fear and actual beliefs, the person's right of self-defense is the same whether the danger is real or merely apparent."

[8] CALJIC No. 5.52 states: "The right of self-defense exists only as long as the real or apparent threatened danger continues to exist. When the danger ceases to appear to exist, the right to use force in self-defense ends."

[9] Parts of the discussion resemble hypothetical discussions at law school. Green argued that self-defense applied to an attack by any "actual living being, whether it be [a] mountain lion, a bear, a dog, a shark, whatever it would be." The judge responded by asking if the risk of an imminent attack by a dog would entitle a person to detonate an atomic bomb.

prosecution's witnesses were over 100 feet away. Appellant was the person who was closest to the dogs, which meant she was in the best position to determine the threat they posed. Green also argued that the defense had established necessity, based on the elements that were set forth in the instruction for that defense.

In rebuttal, Bean argued that the dogs did nothing dangerous, appellant did not need to fire down into the strip mall, and she did so because she was "an emotional wreck at that moment."

### 2. *Analysis*

■ Appellant asks us to hold that self-defense applies to an attack by an animal, based on the "rule of lenity." That rule of statutory construction means that language in a penal law, which is reasonably susceptible to two constructions, is ordinarily given the construction that is more favorable to the offender. (*In re Christian S.* (1994) 7 Cal.4th 768, 780 [30 Cal.Rptr.2d 33, 872 P.2d 574]; *People v. Hernandez* (2003) 30 Cal.4th 835, 869 [134 Cal.Rptr.2d 602, 69 P.3d 446].) The rule is inapplicable here, as we are not asked to interpret a statute.

Respondent maintains that the requested self-defense instructions were properly denied because an attack by an animal is not mentioned in the CALJIC instructions or the accompanying Use Notes. That argument is unpersuasive. The CALJIC Committee cannot be expected to anticipate every issue that may arise at trial. Indeed, the introduction to CALJIC specifically states that the trial court may need to give an instruction that is not included in CALJIC.

Respondent also maintains that there was no evidentiary basis for instructing on self-defense. That would be true if we looked only at the prosecution's case. However, appellant gave extensive testimony on that issue.

■ Requested instructions on a defense must be given if they are supported by substantial evidence, rather than "minimal and insubstantial" evidence. (*People v. Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1].) Evidence is substantial if a reasonable jury could find the existence of the particular facts underlying the instruction. If the evidence is substantial, the trial court is not permitted to determine the credibility of witnesses, which is a task for the jury. (*People v. Wickersham* (1982) 32 Cal.3d 307, 324–325 [185 Cal.Rptr. 436, 650 P.2d 311], disapproved on another point in *People v. Barton* (1995) 12 Cal.4th 186, 201 [47 Cal.Rptr.2d 569, 906 P.2d 531]; *People v. Strozier* (1993) 20 Cal.App.4th 55, 63 [24 Cal.Rptr.2d 362].)

Appellant testified that she fired the gun to prevent an imminent attack by an approaching aggressive dog. It is not for us to determine whether her version of the facts was more or less credible than that of the prosecution's witnesses. Under the applicable rules, her testimony constituted substantial evidence, which required giving the requested instructions on the defense of self-defense, if that defense applies to an attack by an animal.

■ Conceptually, there is nothing in the elements of self-defense, as set forth in the rejected instructions (fns. 3–8, *ante*), that requires the threat to come from a human agency. For self-defense, the defendant must actually and reasonably believe in the need to defend, the belief must be objectively reasonable, and the fear must be of imminent danger to life or great bodily injury. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 [56 Cal.Rptr.2d 142, 921 P.2d 1].) The focus is on the nature of the threat, rather than its source. It serves no public policy, and is neither logical nor fair, to deprive appellant of the defense of self-defense because the threat of imminent harm came from a dog and not from a person. The use of force in defense of oneself should be legitimate, whether or not the source of the threat is a human being. In other words, the use of force in self-defense should not be illegitimate because the source of the threat is not a human being.

We therefore conclude that the trial court here committed error when it refused to instruct on self-defense.

Although there are no cases directly on point, there is further support for that conclusion in existing case law.

Appellant cites *U.S. v. Clavette* (9th Cir. 1998) 135 F.3d 1308, 1311. The defendant there was convicted of violating the Endangered Species Act by killing a grizzly bear. *Clavette* affirmed the conviction because, based on the evidence, a reasonable person could have found beyond a reasonable doubt that the defendant did not kill the bear in self-defense. *Clavette* does not control the problem here, as it involved a statute and federal regulation that specifically named self-defense as a defense to the crime. (16 U.S.C. § 1540(b)(3); 50 C.F.R. § 17.40(b)(1)(i)(B) (2005).) It does show, however, that the drafters of the regulations recognized that self-defense might be necessary to stop an attack by a dangerous animal.

At the oral argument, appellant cited an additional authority, *Devincenzi v. Faulkner* (1959) 174 Cal.App.2d 250 [344 P.2d 322]. In that case, the defendant drove his car into the plaintiff's Great Dane, which was about to attack a teenage boy, and had just injured the defendant's cocker spaniel. The court held that the jury was properly instructed on self-defense and defense of a third person. (*Id.* at pp. 254–255.)

Our own research efforts show, as one might predict, that self-defense cases generally involve attacks by humans on humans. (See generally, 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, §§ 64–77; 2 Wharton, Criminal Law (15th ed. 1994) Homicide, § 127, pp. 180–192; 2 LaFave, Substantive Criminal Law (2d ed. 2003) § 10.4, pp. 142–160.) There are, however, a surprising number of self-defense cases arising from attacks by dogs.

*People v. Adams* (2004) 124 Cal.App.4th 1486, 1494–1495 [21 Cal.Rptr.3d 920], is a recent California case involving that issue. The defendant was convicted of misdemeanor battery pursuant to section 600, which penalizes "[a]ny person who willfully and maliciously and with no legal justification" attacks a peace officer's horse or dog. The prosecution's evidence was that, while hiding in a crawl space to avoid arrest, the defendant struck a police dog, which had sunk its teeth into his leg. The defendant testified that he never hit the dog, and the police officers ordered it to attack him. On appeal, he contended that the trial court should have instructed sua sponte that self-defense against excessive force constituted "legal justification." The *Adams* court found it unnecessary to resolve that issue, as the jury necessarily resolved the issue of self-defense against excessive force against the defendant, based on other instructions that were given. (*People v. Adams, supra*, at pp. 1494–1495.)

Courts across America have assumed the applicability of the defense of self-defense when defendants asserted it in response to charges involving cruelty to animals.[10] (Annot., What Constitutes Offense of Cruelty to Animals—Modern Cases (1992) 6 A.L.R.5th 733, §§ 12[b], 28.)

For example, *People v. Wicker* (1974) 78 Misc.2d 811 [357 N.Y.S. 2d 597], held that the defendant could not be convicted of cruelty to animals, when he shot and killed a vicious dog which ran onto his property and attacked his dog, in the presence of small children.

Similarly, in *Grizzle v. State* (1985) 1985 OKCR 130 [707 P.2d 1210], the defendant was convicted of animal cruelty, based on shooting and killing a dog that was biting his son. Citing *Devincenzi v. Faulkner, supra*, 174 Cal.App.2d 250, the *Grizzle* court reversed the defendant's conviction because the defendant was entitled to instructions on self-defense and the trial court gave incomplete instructions on that subject. (*Grizzle v. State, supra*, at pp. 1212–1213.)

---

[10] The comparable statute in California is section 597, which penalizes "every person who maliciously and intentionally maims, mutilates, tortures, or wounds a living animal, or maliciously and intentionally kills an animal . . . ."

There are also civil cases that hold that officers acted reasonably in shooting and killing privately owned dogs that were running loose and behaving aggressively. (See, e.g., *Altman v. City of High Point, N.C.* (4th Cir. 2003) 330 F.3d 194, 205 (animal control officers); *Warboys v. Proulx* (D.Conn. 2004) 303 F.Supp.2d 111, 117–118 (police officer).)

With the exception of the case at bench, it appears that courts have uniformly recognized that a person has a right to use reasonable self-defense when confronted with an aggressive dog. The lack of precedent for the contrary ruling by the trial court here provides further support for the conclusion that it was erroneous.

### 3. *Prejudice*

Respondent maintains that, assuming the trial court erred in refusing to instruct on self-defense, it is not reasonably probable that the error was prejudicial. (*People v. Breverman* (1998) 19 Cal.4th 142, 176 [77 Cal.Rptr.2d 870, 960 P.2d 1094]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) We do not agree.

Respondent argues that the lack of self-defense instructions caused no prejudice because the jurors necessarily rejected appellant's version of the events, by finding her guilty after being instructed on the defense of necessity. However, as the trial court recognized, *post*, the two defenses have different burdens of proof. The defendant has the burden of proving the defense of necessity by a preponderance of the evidence. (*People v. Waters* (1985) 163 Cal.App.3d 935, 937 [209 Cal.Rptr. 661]; 1 Witkin & Epstein, Cal. Criminal Law, *supra*, Defenses, § 57, p. 393.) For the defense of self-defense, as shown by the language on self-defense in CALJIC No. 9.03.3, the People have the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense. The difference in the burdens of proof means the jurors might have found self-defense even if they did not find necessity.

Moreover, the defense of necessity more properly applies to situations when the person asserting the defense is faced with an extraordinary, or at least unusual, situation. The basic context of this defense is that, "[u]nder the force of extreme circumstances, conduct which would otherwise constitute a crime is justifiable and not criminal; the actor engages in the conduct out of necessity to prevent a greater harm from occurring." (1 Wharton, Criminal Law, *supra*, Defenses, § 90, p. 614, fn. omitted.) This aspect of the defense of necessity is reflected in the first element of the defense under California law, which is that the act charged as criminal must have been done to prevent a significant evil. (*People v. Pepper* (1996) 41 Cal.App.4th 1029, 1035 [48

Cal.Rptr.2d 877].) The jury could reasonably conclude that two marauding dogs are not a "significant evil." This would be consistent with the classic settings in which the defense of necessity has been discussed, such as to steal food to prevent starvation, or to sacrifice the life of another to avoid "drowning, starvation, or other catastrophe." (1 Witkin & Epstein, Cal. Criminal Law, *supra*, Defenses, § 55, p. 391.) While two dogs may not pose a "significant evil" under the defense of necessity, they may very well impart a reasonable belief that the person who is attacked by the dogs needs to defend himself or herself.

We therefore conclude that the fact the jury rejected the defense of necessity does not necessarily mean that it would have rejected the defense of self-defense.

Moreover, there were weaknesses in the prosecution's case that show that the evidence was closely balanced.

Although all of the prosecution's eyewitnesses testified that the stray dogs were not aggressive, they did not agree about the distance between appellant and the dogs. Their estimates ranged between 25 feet (King), 10 or 15 feet (Landeros), 10 to 20 feet (Carlson at the trial), 6 to 8 feet (Carlson at the preliminary hearing), and 20 feet (Sourapas).

Also, the observations of King, Landeros and Carlson began when they heard appellant shouting. Only Sourapas saw appellant walking her dog before the shouting began. According to him, the stray dogs initially moved in appellant's direction, even though he testified they were acting from curiosity, and not anger.

As appellant's counsel argued, appellant was much closer to the dogs than any of the other witnesses. She testified that the dogs were "six to eight feet" away when she fired the shot. She also said that the dogs were angry and aggressive, and one had advanced to a crouching position on the grass, as if about to attack. Her testimony was supported by the defense firearms expert.

It is particularly significant that at the first trial, when the jury was instructed on self-defense, the jurors were unable to reach a verdict on count 1. At the second trial, no instruction on self-defense was given, and the jurors returned a guilty verdict on count 1. That difference between the two trials makes it likely that the instructional error was prejudicial here.

We do not know whether a properly instructed jury would find appellant guilty. We know that the jury below found her guilty without being instructed on her defense. The circumstances mandate reversal for a new trial.

## DISPOSITION

The judgment is reversed.

Cooper, P. J., and Rubin, J., concurred.