Filed 2/19/21  P. v. Wilson CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>AZIZ FARD WILSON,<br><br>    Defendant and Appellant. | E074285<br><br>(Super.Ct.No. SWF1807045)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge.  Affirmed as modified.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos, and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Aziz Fard Wilson quit working at the Phat N Juicy Chicken and Waffles restaurant in Temecula (restaurant) over a dispute over his wages.

1

He returned to the restaurant one night and confronted the owner of the restaurant, Chris Champion, asking for money defendant believed was owed to him. Ken Simon, the manager of the restaurant, suggested that they all go outside on the patio to talk. After arguing outside about defendant's wages, defendant ran inside and tried to open one of the registers. Defendant ran out the front of the restaurant and Champion called the police, indicating that there was an armed robbery in progress.

When Riverside County Sheriff's Deputy Matthew Cramer arrived, he observed defendant, Simon and Champion together in the parking lot and thought they were all involved in the armed robbery. Deputy Cramer demanded that they all get down on the ground. Defendant did not comply and walked aggressively toward Deputy Cramer and his police dog, Dayka. Defendant continued toward him despite Deputy Cramer's warning that the was going to deploy Dayka. Defendant refused to get down on the ground and Dayka was released. Dayka latched onto defendants' arm and defendant struggled with Dayka, scratching at Dayka's snout. It took five deputies and Dayka to eventually subdue defendant and arrest him. Defendant had severe injuries to his arm and abdomen after the incident.

Defendant was charged with eight crimes but was convicted only of delaying a peace officer and interfering with a police dog. Defendant claims that the trial court erred by not instructing the jury that he could lawfully use force against the police dog to defend himself. In supplemental briefing, defendant contends under newly enacted Assembly Bill No. 1950 (Stats. 2020, ch. 328, § 2) (AB 1950), effective January 1, 2021, he is entitled to have this court reduce his formal probation from three years to one year.

2

## FACTUAL AND PROCEDURAL HISTORY

### A.    PROCEDURAL HISTORY

Defendant was charged by the Riverside County District Attorney's office with six felonies consisting of two counts of attempted robbery (Pen. Code,[1] §§ 664, 211; counts 1 & 2); resisting an executive officer by use of force (§ 69; count 3); making criminal threats (§ 422; count 4); burglary (§ 459; count 5); and interfering with a police dog (§ 600, subd. (a); count 6).  He was also charged with two misdemeanors consisting of delaying a peace officer (§ 148, subd. (a)(1); count 7) and interfering with a business (§ 602.1, subd. (a); count 8).

The jury found defendant guilty of counts 6, interfering with a police dog,  and count 7, delaying a peace officer.[2]  The trial court granted defendant's request to reduce count 6 to a misdemeanor.  Defendant was placed on summary probation for 36 months with credit for time served.  He was ordered to complete 80 hours of community service and anger management classes.

### B.    FACTUAL HISTORY

#### 1.    *PEOPLE'S CASE-IN-CHIEF*

On January 16, 2018, Kem Simon was the service manager for the restaurant, which was located on Margarita Road in Temecula.  Chris Champion owned the restaurant.  The restaurant served food and had a full bar.  There was interior eating space

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

[2]  The jury was hung on counts 2 and 4, which were dismissed pursuant to section 1385.  The jury entered not guilty verdicts on counts 1, 3, 5, and 8.

and an outside patio. Defendant had worked at the restaurant as a cook, but had abruptly quit a few days prior to January 16 over a dispute about his wages. RT 38-39, 41-42, 114, 241-242}

On January 16, at around 8:00 p.m., Simon and Champion were both at the restaurant. Defendant entered the restaurant alone and approached Champion who was sitting at a table at the bar. Defendant told Champion he needed to speak with him. Champion was on the phone and told defendant he would be right with him. Defendant yelled that he needed to speak with him "now" and slammed his hands down on the table. He told Champion that he had lied to him. Simon walked to defendant and asked if they could talk outside on the patio and defendant agreed. As they were walking to the patio, he told Champion "I'm gonna fuck you up." Defendant also told Champion that he was going to give him his "motherfucking money today" and that he was "strapped up." Champion believed this meant that defendant had a gun.

Once all three of them were outside on the patio, Champion and defendant started arguing. Defendant demanded money from Champion. Simon suggested they all move out away from the patio out to the parking lot area. Defendant balled up his fists and was moving erratically back and forth. He told them "I'm tired of you motherfuckers." He also said, "I'm strapped up for you n***** and you're gonna pay me." He reached toward his waistline. Simon understood that "strapped up" meant that defendant was carrying a weapon.

Suddenly, defendant ran back into the restaurant. Simon wanted to follow him but Champion stopped him. Champion and Simon stayed outside but could see inside the

4

restaurant through the windows. Defendant ran to one of the cash registers. He appeared to try to open it but could not because it required a code. Defendant then went through the kitchen area to a door that led to a back office. Champion and Simon distributed checks and cash to their employees from the office. Defendant tried to open the door but it was locked. Defendant banged on the door with both fists and then moved back to the bar area. Champion called 911. He told the dispatcher that defendant had a gun and was trying to rob the restaurant.

Defendant walked out of the restaurant and walked back to Champion and Simon. Defendant put his fists up as though he was going to fight Champion. Defendant said, "What the fuck am I supposed to do? You owe me my money. Give me my money." He also said, "I'm going to [fuck] you up if you don't give me my money." Defendant identified himself as a Rolling 60 Crip and that he was going to make sure and get his money. Defendant tried to put his hands on Champion but Simon stayed between them. Simon told defendant that he had to leave.

At that point, Riverside County Sheriff's Deputy Matthew Cramer arrived. Deputy Cramer had a police dog, Dayka, who had passed her police training. Deputy Cramer had been advised that there was a robbery occurring at the restaurant. There had been more than one call reporting the incident and he was advised that either one or three Black males were involved. He also was told that one of them had a weapon.

Deputy Cramer observed Champion, Simon and defendant all standing together in the parking lot. Deputy Cramer told all three of them to put their hands up and then told

5

them to get down on the ground.[3]  Both Simon and Champion complied and went down on the ground.  Defendant remained standing.  Simon could see that defendant was becoming emotional and tears were running down his face.

Deputy Cramer advised defendant that he needed to get down or he was going to release his dog, which he was holding next to him.  Deputy Cramer told defendant two more times to get down on the ground but defendant failed to comply.  Defendant walked briskly toward Deputy Cramer with his fists balled up.  He told Deputy Cramer, "You're gonna have to let that motherfucking dog go."  Defendant also told Deputy Cramer, "Shoot me, motherfucker.  You're gonna have to shoot me."  Deputy Cramer became concerned that defendant was going to fight with him.  Deputy Cramer again warned defendant that he was going to let Dayka go.  Defendant was within 20 or 25 feet of Deputy Cramer when he let Dayka go; Dayka was trained to protect Deputy Cramer.

Dayka first bit defendant on his abdomen.  Defendant continued to defy Deputy Cramer by not laying down on the ground despite the dog biting him.  Defendant struggled with Dayka, trying to remove the dog from his abdomen by grabbing the dog's mouth with both hands.  Defendant pulled Dayka off of him holding both Dayka's upper and lower jaws.  Dayka appeared to be in pain.  Dayka was squirming and clearly uncomfortable.  It appeared to Champion that defendant put his weight on Dayka to get her off of him.  Defendant grabbed Dayka around the neck.

---

[3] Deputy Cramer had them all put their hands up because he did not know defendant was the perpetrator and Simon and Champion were the victims.

6

Dayka freed herself and latched onto defendant's arm. Deputy Cramer approached defendant and Dayka, worried that Dayka was going to be hurt. Defendant grabbed at Dayka's snout area with his left hand trying to get her off of him. Several other deputies arrived and Deputy Cramer continued to instruct defendant to show his hands and lay on the ground but defendant did not comply.

Defendant was yelling to Deputy Cramer to get the dog off of him but defendant refused to lay down on the ground. Deputy Cramer advised defendant he would not call off Dayka until he got down on the ground. Deputy Cramer and four other deputies approached and pulled defendant's legs straight but he was still resisting. Deputy Cramer tried to pull defendant's free hand behind his back in order to handcuff him, but defendant kept pulling away. Defendant used his free hand to scratch at Dayka's snout. It appeared that defendant was trying to hurt Dayka so she would let go of his arm.

Four other deputies had to assist Deputy Cramer to get control of defendant's free hand and put it behind defendant's back in order to handcuff him. Deputy Cramer had to punch and hit defendant but defendant still resisted. Dayka stayed latched to defendant's other arm. Another officer employed a carotid hold in order to subdue defendant. Eventually all of the officers were able to handcuff defendant and Deputy Cramer ordered Dayka to release defendant's arm.

Defendant had injuries to his arm and abdomen. There was tearing because defendant tried to pull away from Dayka. Defendant had to be treated at the hospital for his injuries. He required a large number of staples. Defendant did not have a weapon.

The 911 call from that night was played for the jury. Champion and defendant could be heard on the call. Champion told the dispatcher that there was "guy" at the restaurant who was trying to rob them. Champion was heard telling defendant, "get up off me, man." Defendant responded, "N****, what are you gonna do?" Defendant, Champion and another man could be heard arguing. Champion told the dispatcher that defendant threatened him and that he had a weapon. Champion thought he saw the weapon in defendant's pocket. Deputy Cramer then arrived.

A cell phone video was played for the jury. Defendant asked Deputy Cramer to call off Dayka and that the dog was hurting him. Deputy Cramer told defendant he had to lay down on the ground with his arms out and he would call off Dayka. Deputy Cramer advised defendant that Dayka would continue to bite him unless he complied.

### 2. *DEFENSE*

Benjamin Martinez was working at the restaurant on the night of January 16. He observed defendant talking with Simon and Champion; defendant appeared calm. Martinez videotaped with his cellular telephone defendant and Dayka. Martinez yelled to Deputy Cramer to call the dog off of defendant. Defendant appeared to be in a lot of pain. Martinez never saw defendant try to hit or hurt Dayka. It appeared he was just trying to get the dog off of him.

Defendant testified that he left his employment at the restaurant because he believed that he was not being paid his appropriate wages. On January 16, defendant had been driving by the restaurant and saw that Champion was inside. He went inside to

8

discuss the unpaid wages he was owed. They started arguing over his wages. Champion told him that he did not owe him "shit." They both stood up.

Simon approached and they all went out to the patio. Defendant never told them that he was "strapped" or that he was part of a gang. Champion continued to deny that he owed defendant money. Defendant got angry. He also thought Simon and Champion were planning to gang up on him. Defendant never told them he was going to rob the restaurant. Defendant went back in the restaurant to try to find the ledger to reconcile what he was owed by Champion. He looked by one of registers but could not find it. He tried to get into Champion's office but it was locked. He did not try to take any money.

Defendant went back outside. Champion was talking to the 911 dispatcher stating that defendant was trying to rob the restaurant and had a weapon. Defendant got upset and argued with Champion. Champion put his hand on defendant's chest and defendant slapped it away. Defendant tried to speak with Simon about how he was going to get his unpaid wages. Champion told defendant the police were coming and that he should leave. Simon and defendant started walking toward defendant's car. Defendant was emotional talking to Simon. Simon advised him to just leave.

Deputy Cramer then arrived at the restaurant. Defendant did not hear Deputy Cramer yell at him. Defendant put his hands up and walked toward

Deputy Cramer yelling "I am not a threat. I am not a threat." He walked toward the spotlight. Defendant did not hear anything that Deputy Cramer yelled at him; he just kept saying he was not a threat. He never said to shoot him or to release the dog.

Defendant started to get down on the ground when Dayka was released. Dayka latched onto his arm. Defendant grabbed Dayka's snout trying to get him to release him because he was afraid the dog would rip his skin. Defendant was able to get Dayka off of him, and put his hands up. He told Deputy Cramer, "Please get the dog." Deputy Cramer did nothing and Dayka bit him in the abdomen. Defendant pulled apart Dayka's jaws but she latched onto his arm. He told Deputy Cramer he would get down if Deputy Cramer called off Dayka. He could not hear Deputy Cramer's demands to get facedown on the ground.

Defendant insisted during the time he struggled with the deputies, his arm was pinned under his body. One of the deputies got on top of him and he could not get his arm out from underneath him. He could not have had his arm free to get at Dayka. One of the deputies punched him. He denied that he was resisting the officers or Dayka. He never shouted to Deputy Cramer to let Dayka go and to shoot him.

He briefly passed out when the officer executed a carotid hold on him. He was not fighting to keep his left arm from the deputies; it was pinned underneath

10

him.  He had puncture wounds on his abdomen and he had a bite taken out of his arm.  He had 64 staples put in to close his wounds.

## DISCUSSION

Defendant contends the trial court erred in its instructions to the jury on self-defense against the police dog, Dayka.  Defendant insists the trial court failed to modify the standard instruction to clarify that he could use reasonable force against Dayka to defend against imminent danger to his safety and that this constituted a valid defense to the charge in count 6.  Such instructional error violated his federal and state Constitutional rights to present a defense in violation of his due process rights.

### A.     ADDITIONAL FACTUAL HISTORY

The jury was instructed as to count 6, as follows:  "To prove that the defendant is guilty of this crime, the People must prove that: [¶]  1.  The defendant willfully and maliciously struck or beat a dog; [¶] 2.  The dog was under the supervision of a peace officer; [¶]  3.  The peace officer was discharging or attempting to discharge his or her duties; [¶]  4.  The defendant had no legal justification to strike or beat the dog.  [¶] Someone commits an act willfully when he or she does it willingly or on purpose.  [¶] Someone acts maliciously when he or she intentionally does a wrongful act or when he or she acts with an unlawful intent to annoy or injure.  [¶]  To beat means to use more force than was necessary under the circumstances.  [¶]  Please refer to CALCRIM 2670 to determine if: [¶]  1.  The peace officer was discharging or attempting to discharge his duties; and [¶]  2.  If the defendant had a legal justification to strike or beat the dog.  [¶]

11

The People must prove beyond a reasonable doubt that the defendant struck or beat the dog without legal justification."[4]

CALCRIM No. 2670 instructed the jury on whether Deputy Cramer was lawfully discharging his duties as a peace officer for counts 3, 6, and 7. It provided in pertinent part, "A peace officer is not lawfully performing his or her duties if he or she is unlawfully detaining someone or using unreasonable force in his or her duties. . . . [¶] . . . [¶] A peace officer may use reasonable force to arrest or detain someone, to prevent escape, to overcome resistance, or in self-defense. [¶] If a person knows, or reasonably should know, that a peace officer is arresting or detaining him or her, the person must not use force or any weapon to resist an officer's use of reasonable force. . . . If a peace officer uses unreasonable or excessive force while arresting or attempting to arrest or detaining or attempting to detain a person, that person may lawfully use reasonable force to defend himself or herself. [¶] A person being arrested or detained uses reasonable force when he or she: [¶] 1. Uses that degree of force that he or she actually believes is reasonably necessary to protect himself or herself from the officer's use of unreasonable or excessive force; and [¶] 2. Uses no more force than a reasonable person in the same situation would believe is necessary for his or her protection. [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the officer was lawfully performing his duties. If the People have not met this burden, then you must find the defendant not guilty."

---

[4] The trial court prepared the instruction as there was no standard CALCRIM instruction and there was no objection by defense counsel.

The jury was instructed on self-defense pursuant to CALCRIM No. 3470 as follows: "Self-defense is a defense to resisting or trying to prevent an executive officer from performing his duty as charged in Count 3; interfering with a police dog as charged in Count 6; and delaying a peace officer as charged in Count 7. The defendant is not guilty of those crimes if he used force against the other person in lawful self-defense. The defendant acted in lawful self-defense if: [¶] 1. The defendant reasonably believed that he was in imminent danger of suffering bodily injury; [¶] 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; and [¶] The defendant used no more force than was reasonably necessary to defend against that danger. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed that there was an imminent danger of bodily injury to himself. The defendant's belief must have been reasonable and he must have acted because of that belief. The defendant is only entitled to use the amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in lawful self-defense. [¶] When deciding whether the defendant's beliefs were reasonable, consider all of the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to actually have existed. [¶] The defendant's belief that he was threatened may be reasonable even if he relied on information that was not true. However, the defendant must actually and reasonably have believed that the

13

information was true. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. If the People have not met this burden, you must find the defendant not guilty of preventing an officer from performing his duty, interfering with a police dog, or delaying a peace officer." The jury was further instructed, "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

## B.      SELF-DEFENSE INSTRUCTIONS

Defendant insists that the instructions on self-defense were flawed as to count 6 as they misled the jury into thinking that they could not consider if he could use self-defense against the police dog. He insists the trial court erred by failing to modify the self-defense instruction to include self-defense against an animal. Such instructional error was prejudicial.

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.' . . . Included within this duty is the '. . . obligation to instruct on defenses, . . . and on the relationship of these defenses to the elements of the charged offense . . .' where '. . . it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense.' " (*People v. Stewart* (1976) 16 Cal.3d 133, 140.)

"The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citations.]" (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "We determine the correctness of the jury instructions from the entire charge of the

14

court, not from considering only parts of an instruction or one particular instruction." (*People v. Smith* (2008) 168 Cal.App.4th 7, 13.)

Here, defendant was convicted of battery upon a police dog. Section 600, subdivision (a) provides, in relevant part, "Any person who willfully and maliciously and with no legal justification strikes, beats, kicks, cuts, stabs, shoots with a firearm, administers any poison or other harmful or stupefying substance to, or throws, hurls, or projects at, or places any rock, object, or other substance which is used in such a manner as to be capable of producing injury and likely to produce injury, on or in the path of, a horse being used by, or a dog under the supervision of, a peace officer in the discharge or attempted discharge of his or her duties, or a volunteer who is acting under the direct supervision of a peace officer in the discharge or attempted discharge of his or her assigned volunteer duties, is guilty of a public offense."[5]

"[C]ourts have uniformly recognized that a person has a right to use reasonable self-defense when confronted with an aggressive dog." (*People v. Lee* (2005) 131 Cal.App.4th 1413, 1429.) However, the use of self-defense when a police dog is involved is different. A police dog should be considered "an instrumentality of" the police officer. (*People v. Rivera* (1992) 8 Cal.App.4th 1000, 1005.)

In *People v. Adams* (2004) 124 Cal.App.4th 1486, the suspect ran from the officer and hid in nearby bushes. The officer deployed his police dog who latched onto the suspect's leg. The suspect hit the dog with a stick and was charged with a violation of

---

[5] The trial court reduced the conviction to a misdemeanor based on the fact that the police dog suffered no injuries.

15

section 600, subdivision (a). (*Adams*, at pp. 1489-1491.) On appeal, the defendant contended that the trial court erred by failing to define "legal justification" as the term was used in section 600. (*Adams*, at pp. 1492-1493.) The trial court found that any failure to instruct the jury with a definition of "legal justification" was harmless as the jury necessarily decided the issue against defendant. It concluded, "The instructions given informed the jury that in a prosecution under section 600, the People had the burden of proving beyond a reasonable doubt that the officers were engaged in the performance of their duties, that an officer is not engaged in the performance of his duties if he uses unreasonable or excessive force in attempting to make the arrest, and if the jury had a reasonable doubt the officers were using reasonable force, they should find [the defendant] not guilty of battery on a police dog. They were further instructed they could not convict [the defendant] of a violation of section 600 if they found an officer used unreasonable or excessive force and [the defendant] used only reasonable force to protect himself. [¶] Under these instructions, the jury was obligated to acquit [the defendant] of battery on a police dog if it found the officers used excessive force and [the defendant] used only reasonable force to protect himself. Thus, by convicting [the defendant] of battery on a police dog, the jury necessarily resolved the issue of self-defense against excessive force against him." (*Id.* at p. 1495.)

Based on the foregoing, the issue for the jury here was whether Deputy Cramer properly performed his duty by deploying Dayka, or if he used unreasonable or excessive force in deploying the police dog to subdue defendant. Only if the deployment of Dayka was considered excessive force would defendant be entitled to use reasonable force

16

against the police dog, as the jury was instructed by CALCRIM Nos. 2670 and 3470. The instructions as a whole clearly advised the jurors if Deputy Cramer's deployment of the police dog constituted unreasonable or excessive force, he was entitled to use reasonable force to defend himself against the police dog. CALCRIM No. 2670 and the instruction on CALCRIM No. 600 specifically referenced that Deputy Cramer had to be lawfully performing his duties in deploying Dayka.

Defendant appears to claim that he was entitled to an instruction that advised the jurors that if the police dog used excessive force against him, and he reasonably believed that he needed to use force to "thwart the dog," he was entitled to have the jury consider that this was a valid defense to count 6. However, it is clear that in the context of a police dog, a defendant can claim self-defense only if the deployment of the police dog is considered unreasonable or excessive force. Defendant has provided nothing to this court to support that he was entitled to a self-defense instruction, as he so claims, without the jury first determining if the deployment of Dayka was unreasonable or excessive force.

Here, the jury was properly instructed on self-defense. The jury was told in both the instruction on the violation of section 600 and CALCRIM No. 2670 that it must determine if Deputy Cramer was lawfully performing his duty as a peace officer by deploying the police dog. As stated, section 600 requires the jury find that the dog was under "under the supervision of, a peace officer in the discharge or attempted discharge of his or her duties." In discharging that duty, Deputy Cramer could not use excessive force, which applied to deployment of the dog. Defendant could not use force against the police dog unless the deployment was considered excessive force.

17

The jury was further instructed with CALCRIM No. 3470, that if it found Deputy Cramer did use excessive or unreasonable force, it could consider defendant's actions against Dayka as self-defense. CALCRIM No. 3470 did not use the term "animal" but it specifically stated that "The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. If the People have not met this burden, you must find the defendant not guilty of preventing an officer from performing his duty, interfering with a police dog, or delaying a peace officer." The instructions as a whole properly instructed on self-defense in this case.

Defendant relies on *People v. Lee*, *supra*, 131 Cal.App.4th 1420 to support his claim that he was entitled to have the jury instructed that he could use self-defense against the police dog if the police dog used excessive force. However, *Lee* involved an attack on an off-duty police officer by two dogs that were not police dogs. (*Id.* at pp. 1415-1421.) The findings in *Lee* are not applicable to this case, which involved a police dog.

Defendant contends that the erroneous jury instructions infringed upon his right to present a defense in violation of his due process rights under the federal and state Constitutions. As such, this court must determine prejudice under the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24.

Here, we have found no error in the instructions. The jury necessarily resolved the question of whether Deputy Cramer used excessive force against defendant by finding defendant guilty in counts 6 and 7. Count 7 involved a charge of delaying a peace officer. Section 148 makes it a misdemeanor to "willfully resist[] . . . any . . . peace

officer . . . in the discharge or attempt to discharge any duty of his or her office or employment." The jury necessarily resolved that Deputy Cramer was properly performing his duties and did not use unreasonable or excessive force. As such, defendant was not entitled to avoid prosecution of section 600 by claiming self-defense. Reversal for instructional error is not required.

C. ASSEMBLY BILL NO. 1950

Defendant contends his three-year probation term should be reduced to one year because section 1203a, under which he was sentenced to three years formal probation, has been amended by AB 1950 effective January 1, 2021, and the maximum probationary sentence he can receive is one year. He contends the change applies retroactively to his case, which is not final. The People contend AB 1950 should not be applied retroactively.

When defendant was sentenced, section 1203a provided that a trial court may grant misdemeanor probation "for a period not to exceed three years" and that if "the maximum sentence provided by law exceeds three years imprisonment, the period during which sentence may be suspended and terms of probation enforced may be for a longer period than three years, but in such instance, not to exceed the maximum time for which sentence of imprisonment might be pronounced." (Former § 1203a.)

Effective January 1, 2021, AB 1950 amended section 1203a to provide, "In all counties and cities and counties, the courts therein, having jurisdiction to impose punishment in misdemeanor cases, may refer cases, demand reports, and to do and require anything necessary to carry out the purposes of Section 1203, insofar as that

19

section applies to misdemeanors. The court may suspend the imposition or execution of the sentence and make and enforce the terms of probation for a period not to exceed one year." (§ 1203a.)

Defendant insists the change to section 1203a applies retroactively to him under the reasoning of *In re Estrada* (1965) 63 Cal.2d 740, 748 (*Estrada*) even though the Legislature did not state that the change was intended to apply retroactively. The People contend AB 1950's misdemeanor probation limitation is not subject to the *Estrada* presumption of retroactivity. They contend the *Estrada* presumption applies only to criminal laws that reduce punishment and, according to the People, probation is not punishment.

"Assembly Bill No. 1950 is silent on retroactivity; it does not create a mechanism by which probationers may petition for early termination." (*People v. Quinn* (2021) 59 Cal.App.5th 874, 884 (*Quinn*).) In *Estrada*, the court held, "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final." (*Estrada*, *supra*, 63 Cal.2d at p. 745.)

Recently, in *People v. Sims* (2021) 59 Cal.App.5th 943 (*Sims*), another appellate court found that despite probation not technically being punishment, the retroactive rule of *Estrada* applied to AB 1950.[6] It found, "The People are correct that '[a] grant of probation is "qualitatively different from such traditional forms of punishment as fines or imprisonment." ' [Citation.] Probation is primarily rehabilitative and a grant of probation is considered an act of grace or clemency in lieu of traditional forms of punishment." (*Id.* at p. 958.) It further found, "However, we do not believe the label affixed to probation—i.e., whether it is labeled punishment, rehabilitation, or some combination—is necessarily determinative of whether the *Estrada* presumption of retroactivity applies. When a court places a defendant on probation, it may, of course, fine the defendant or order the defendant confined in jail, or both. [Citation.] But it has discretion to impose a variety of other probation conditions as well. It may, for example, require that the probationer submit to searches of electronic devices and social media accounts [citation], submit to periodic drug testing [citation], refrain from associating with persons or groups of persons [citation], and obtain permission from a probation officer before changing addresses or leaving the state or county. (*Id.* at p. 959.)

The *Sims* court recognized that by "limiting the maximum duration a probationer can be subject to such restraint, Assembly Bill No. 1950 has a direct and significant ameliorative benefit for at least some probationers who otherwise would be subject to additional months or years of potentially onerous and intrusive probation conditions."

---

[6] *Sims* involved the changes to felony probation made by AB 1950, but the reasoning is the same.

(*Sims*, *supra*, 59 Cal.App.5th at p. 959.) As such, "by limiting the duration of felony probation terms, Assembly Bill No. 1950 ensures that at least some probationers who otherwise would have been imprisoned for probation violations will remain violation-free and avoid incarceration." (*Id*. at p. 960.)

The *Sims* court also found that, "Assembly Bill No. 1950 does not contain a savings clause evincing a clear intent to overcome the *Estrada* presumption of retroactivity. 'Nor do we perceive in the legislative history a clear indication that the Legislature did not intend for the statute to apply retroactively.' [Citation.] On the contrary, the legislative history for Assembly Bill No. 1950 suggests the Legislature harbored strong concerns that probationers—including probationers whose cases are pending on appeal—face unwarranted risks of incarceration due to the lengths of their probation terms." (*Sims*, *supra*, 59 Cal.App.5th at p. 961.)

The *Sims* court concluded, "For all these reasons, we conclude the two-year limitation on felony probation set forth in Assembly Bill No. 1950 is an ameliorative change to the criminal law that is subject to the *Estrada* presumption of retroactivity. The Legislature did not include a savings clause or other clear indication that the two-year limitation applies on a prospective-only basis. Therefore, we conclude the two-year limitation applies retroactively to all cases not reduced to final judgment as of the new law's effective date. Here, defendant's case was pending on direct appeal and thus was not final as of Assembly Bill No. 1950's effective date. Accordingly, the defendant is entitled to seek a reduced probation term on remand under Assembly Bill No. 1950." (*Sims*, *supra*, 59 Cal.App.5th at p. 964.)

22

The court in *Quinn* came to the same conclusion finding that since "the Legislature has determined that the rehabilitative function of probation does not extend beyond two years, any additional period of probation can only be regarded as punitive, and therefore within the scope of *Estrada*." (*Quinn*, *supra*, 59 Cal.App.5th at p. 883.)

We follow the reasoning in *Sims* and *Quinn* and conclude that the changes to section 1203a apply to defendant's sentence. Defendant is entitled to the benefit of the change to section 1203a. As such, we will order that defendant's probationary sentence be reduced from three years to one year. (*Quinn*, *supra*, 59 Cal.App.5th at p. 885.)

## DISPOSITION

The order granting probation is modified and reduced to one year. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

SLOUGH
J.

FIELDS
J.