Filed 9/15/16  P. v. Mathews CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B260920 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA087315) |
| v. | |
| RICARDO MATHEWS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathryn A. Solorzano, Judge.  Affirmed as modified.

Steven A. Brody, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and Stacy S. Schwartz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Defendant Ricardo Mathews appeals from a judgment of conviction entered after a jury found him guilty of assault by means likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)),[1] second degree robbery (§ 211), and dissuading a witness (§ 136.1, subd. (b)(1)). Defendant claims the trial court erred in refusing to instruct the jury on self-defense, and erred in not staying his sentence pursuant to section 654 for dissuading a witness. We conclude the trial court did not err in refusing to instruct the jury on self-defense because the defense was not supported by substantial evidence. We also conclude that defendant's sentence for dissuading a witness should have been stayed pursuant to section 654 and modify the judgment accordingly.

# FACTS

A.    *Prosecution Evidence*

During defendant's trial, prosecution witnesses provided the following testimony: On the night of May 5, 2014, Bradley Clemm and Stefanja Pytel, who were guests staying in room 305 of the Luxury Lofts Hotel in Santa Monica, went to sleep in their room. Around 2:00 a.m., Pytel was awakened by the sound of someone yelling "guest services" in the hallway outside their room. She heard the sound of the door to the room being unlocked, then defendant entered the room. He stood at the end of the bed, wearing only long underwear bottoms and a beanie.

Pytel sat up in the bed and said, "Excuse me. Can I help you?" This woke Clemm, who asked defendant who defendant was and told defendant to get out. Defendant backed out of the room towards the doorway, asked if they were porn stars, and said he was from "guest services."[2] Clemm said defendant had the wrong room and

---

[1]    All further statutory references are to the Penal Code.

[2]    Defendant submitted evidence in support of his motion to strike his prior conviction that he had a history of mental health issues, exacerbated by drug use and homelessness.

told defendant to leave and not come back. Defendant had a bowl of keys on the floor near his feet, which he picked up. Defendant said he would be back later. Clemm closed and locked the door. Pytel called the hotel manager, who told her that the police had been notified.

About 20 minutes later, Clemm heard a key slide into the lock and could hear the key turning the lock. Clemm went to the door and opened it. Defendant was standing by the door. Clemm asked defendant for the key, but defendant took the key, walked down the hall, and began trying keys in another door. Clemm followed defendant down the hall, asking several times for defendant to give him the key to Clemm and Pytel's room. Pytel came out into the hallway and also asked defendant to give them the key. Pytel told Clemm, "Grab the keys from him so he can't come back in." Defendant responded, "I wouldn't do that if I were you."

According to Clemm, defendant walked past Clemm and pushed Pytel. Clemm told defendant not to push Pytel.[3] Defendant turned and hit the right side of Clemm's mouth with his fist. According to Clemm, the hit was "really, really hard." Clemm lost his balance and fell to the ground. Defendant hit him three more times in the face, leaving a "big hole" above his lip. Defendant also repeatedly stomped on Clemm's head and punched Clemm. At some point, Clemm lost consciousness.

Defendant told Clemm, "[g]et up, punk." Pytel tried to push defendant off of Clemm and yelled at defendant to stop. Defendant approached Pytel and gave her a "terrifying look." Pytel picked up her cell phone, called 911, and told defendant that she was calling the police. Defendant tried to grab the phone, knocking Pytel's arm into the wall and causing the phone to fall to the ground. Both Pytel and defendant lunged for the phone, but defendant was able to grab the phone before Pytel. Defendant jumped over Clemm, who was still on the ground, and left with Pytel's cell phone.

---

[3]      Pytel did not testify that defendant pushed her.

Clemm heard Pytel say, "[g]et up, get up, he's stolen my phone." Clemm managed to get back on his feet and returned with Pytel to their hotel room. The police arrived about 10 minutes later. They took Clemm downstairs, where he identified defendant.

Later, during the day of May 6, Clemm went to the doctor and received 10 stitches to close the hole in his lip. He also had a severe headache and received a prescription for painkillers. About two days after the incident, Clemm and Pytel went to Hawaii for a vacation, but Clemm was in such pain that they cut their vacation short and returned home.

Santa Monica Police Officer Matthew Lieb and others responded to a call at the hotel and discovered defendant on the second floor. Defendant did not have any identification on him but invited the officers to room 203, where defendant had been staying. Inside the room, Officer Lieb saw a basket full of maintenance materials and the bowl of keys.

According to Babak Mortazavi, the owner of the Luxury Lofts Hotel, defendant was not a registered guest at the hotel. The bowl of keys was normally kept locked up at the hotel. One of the rooms at the hotel was used as an office, and employees had an access code to gain entrance to the room. There was no staff on duty at the hotel after 7:00 p.m. When Mortazavi received a call from a guest about the incident at the hotel, he asked his assistant, Lazlo Vandor, to go to the hotel to investigate the problem. Vandor arrived at the hotel to find the police were already there. The police took Vandor to room 203, where they had defendant detained. Although the room was supposed to be empty, Vandor saw a duffle bag resembling those used at the hotel for laundry. Vandor checked the hotel's maintenance area and discovered the locker where the spare keys were kept had been ripped open.

Video recordings of the attack were played for the jury. The first video recording captured Clemm pursuing defendant around a corner in the hallway and grabbing at

4

defendant.[4]  Defendant turned and punched Clemm in the face.  After Clemm fell to the ground, defendant punched Clemm in the face several more times and stomped repeatedly on Clemm's head.  Pytel could be heard in the background on the video telling Clemm to get up.  Defendant walked out of view of the camera toward Pytel.  Clemm tried to get up; defendant walked back into view and punched Clemm again.  He again walked toward Pytel and then returned, leaned over Clemm and said, "[g]et up, punk."

Another video recording showed defendant holding a cell phone in his hand while Pytel was asking defendant to give the phone back to her, Clemm struggling to get up, defendant jumping over Clemm, who was still on the ground, and defendant leaving the area through a doorway at the end of the hallway.

B.    *Defense Evidence*

Defendant did not testify or present any other evidence.

C.    *Self-Defense Instruction Request*

Defense counsel requested a self-defense instruction, explaining that defendant did not make any physical contact with Clemm or Pytel when he entered their room and then left.  She stated, "we heard from Ms. Pytel who said that Mr. Clemm was standing behind [defendant] while she's yelling, 'Babe, grab the key.  Babe, grab the key.'  Mr. Clemm is 6-foot-3.  [Defendant] is 5-foot-7. . . .  So you have this hulking man behind you who is saying, 'Give me the key.  Give me the key.'. . .  And then she admits that she reaches over and tries to grab the key.  So now . . . [defendant] is, in effect, having two people behind him, both taller than he is, and I believe that self-defense is at issue here."

The trial court noted "it appears that the initiation or the initial contact, the initial punch was not captured by video" and asked if both counsel agreed.  Counsel for both

---

[4]    According to Clemm, before he pursued defendant around the corner, coming into view of the camera, defendant pushed Pytel and then punched Clemm, which was not captured by the camera.

parties agreed. The court asked if defendant was going to testify. Defense counsel responded that it was not likely. The prosecutor argued there was no evidence to support a self-defense instruction. However, the trial court noted the inconsistency in Clemm's and Pytel's testimony regarding whether defendant pushed Pytel. It stated it did not know if, based on that inconsistency, "the jurors could, if they chose to, infer that the aggressor at that stage was, actually, Mr. Clemm in response to having seen his girlfriend struck by the defendant." The court stated it wanted to do some research and think about the matter. It thus took the matter under submission.

During a subsequent discussion on jury instructions, the trial court noted from its research on the issue of self-defense, "the court has to examine the record to determine whether there is substantial evidence in the record which would support giving the instruction. I know that the defense wants the instruction, but at this point, there is this void or gap in the case, in terms of facts, that would support the instruction[]."

Defense counsel pointed out there was a portion of the video in which Clemm was moving toward defendant, and defendant "is actually backing up." She argued this showed aggression on Clemm's part. In addition, she argued there was evidence of Clemm and Pytel, who were bigger than defendant, behind him, trying to get the key from him. Based on that, defense counsel believed there was sufficient evidence to support an instruction on self-defense.

The trial court reviewed the witness testimony, including conflicts between Clemm's and Pytel's testimony. The court determined neither witness testified that he or she touched defendant before defendant hit Clemm. It stated, "[t]here is no evidence of that. The jurors may find that they don't believe that story. But it doesn't give them an alternative story which then supports self-defense. There is just this void, this gap. There is no evidence." The court further stated that there was no evidence from which the jury could "make a determination that[,] subjectively or objectively, the defendant felt the need to defend himself." The trial court therefore denied the request for a self-defense instruction.

6

D.      *Jury's Verdict and the Court's Sentence*

On September 26, 2014, the jury found defendant guilty of second degree robbery (§ 211), dissuading a witness (§ 136.1, subd. (b)(1)), and assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)), during the commission of which he personally inflicted great bodily injury on his victim (§ 12022.7, subd. (a)).  The jury acquitted defendant of burglary (§ 459).

During a hearing on November 20, 2014, defendant admitted he suffered a prior conviction for a serious felony (§§ 667, subds. (a)(1), (b)-(i), 1170.12, subds. (a)-(e)).

On December 15, 2014, the trial court sentenced defendant to an aggregate state prison term of 17 years, four months, consisting of six years for the assault by means likely to produce great bodily injury (midterm of three years doubled pursuant to the strike prior); three additional years for the special allegation for that charge; a consecutive two-year term for the robbery (one-third the midterm of three years, doubled pursuant to the strike prior); a consecutive 16-month term for dissuading a witness (eight months, doubled for the strike prior); and five years for a serious felony prior.  The same day, defendant filed a notice of appeal from the judgment entered on November 20, 2014.

On December 18, 2014, the court modified defendant's sentence, changing the 16-month sentence for dissuading a witness to run concurrent, rather than consecutive, to the sentences for the assault by means likely to produce great bodily injury and the robbery. Defendant was therefore sentenced to an aggregate state prison term of 16 years.[5]

**DISCUSSION**

A.      *The Trial Court Did Not Err in Refusing To Instruct on Self-Defense*

Defendant argues the trial court erred in failing to instruct the jury on self-defense, resulting in prejudice to defendant. We disagree.

---

[5]      The abstract of judgment correctly reflects the 16-month concurrent term for the dissuading a witness conviction, but incorrectly states that the aggregate prison term is 17 years and four months.

7

The trial court must instruct the jury on a defense on request by the defendant only if the defense is supported by substantial evidence. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1049; *People v. Lee* (2005) 131 Cal.App.4th 1413, 1426.) "'Substantial evidence is "evidence sufficient 'to deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.'"' [Citations.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 331; accord, *People v. Larsen* (2012) 205 Cal.App.4th 810, 823.) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . .' [Citations.]" (*People v. Salas* (2006) 37 Cal.4th 967, 982-983; accord, *Larsen*, *supra*, at pp. 823-824.) The court must resolve any doubts regarding the sufficiency of the evidence in favor of the defendant. (*Larsen*, *supra*, at p. 824.)

"'To justify an act of self-defense for [an assault charge under . . . section 245], the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him. [Citation.]' [Citation.] The threat of bodily injury must be imminent [citation], and '. . . any right of self-defense is limited to the use of such force as is reasonable under the circumstances. [Citation.]' [Citations.]" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064-1065.) The reasonableness of the defendant's belief in the need for self-defense is evaluated objectively, and "reasonableness is determined from the point of view of a reasonable person in the defendant's position. The jury must consider all the facts and circumstances it might '"expect[] to operate on [defendant's] mind . . . ."' [Citation.]' [Citation.]" (*Id*. at p. 1065.)

As the trial court found, there was no evidence defendant actually believed he was in imminent danger of suffering bodily injury at the hands of Clemm and Pytel. They did not threaten any sort of physical harm; they were merely demanding that he give them the key to their room. That defendant was not in fear of any physical harm is evidenced by the fact that when Pytel told Clemm to grab the keys from defendant, he responded with the threat, "I wouldn't do that if I were you."

8

Defendant argues that it would have been reasonable for him to believe he was in imminent danger of bodily injury because Clemm was significantly taller than he was. But "'self-defense requires both actual subjective belief and objective reasonableness.'" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1093 (conc. opn. of Brown, J.); accord, *People v. Butler* (2009) 46 Cal.4th 847, 868.) Absent evidence defendant was in actual fear of imminent bodily harm, no instruction on self-defense was required.

Moreover, the right to self-defense extends for "only as long at the danger exists or reasonably appears to exist." (*People v. Clark* (2011) 201 Cal.App.4th 235, 250.) Even if defendant was justified in punching Clemm as he grabbed for the keys, he was not justified in continuing to punch and kick Clemm as he lay on the ground. There is no evidence defendant actually or reasonably believed he was in imminent danger of bodily injury when he continued his attack on the prostrate Clemm and then told him, "[g]et up, punk." The trial court did not err in refusing to instruct the jury on self-defense.

B.      *Defendant's Sentence for Dissuading a Witness Should Have Been Stayed*

Defendant contends, and the People agree, that the sentence for dissuading a witness should have been stayed under section 654 because it was part of the same continuous course of conduct as the robbery. We agree as well.

Section 654, subdivision (a), precludes the imposition of multiple punishments for the same criminal act or omission. It provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ." The question whether section 654 applies is one of fact for the trial court, which is vested with broad discretion in making its determination. (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1378.) We review the trial court's factual determinations for substantial evidence (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338), viewing the evidence in the light most favorable to those determinations (*Ortiz*, *supra*, at p. 1378; *People v. Jones* (2002) 103 Cal.App.4th 1139, 1143).

9

"The test for determining whether section 654 prohibits multiple punishment has long been established:  'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'  [Citation.]"  (*People v. Britt* (2004) 32 Cal.4th 944, 951-952.)  "If, on the other hand, [the] defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.'  [Citation.]"  (*People v. Harrison* (1989) 48 Cal.3d 321, 335; accord, *People v. Vu* (2006) 143 Cal.App.4th 1009, 1033.)  "'"The principal inquiry in each case is whether the defendant's criminal intent and objective were single or multiple."  [Citation.]  "A defendant's criminal objective is 'determined from all the circumstances . . . .'"'  [Citation.]"  (*People v. Sok* (2010) 181 Cal.App.4th 88, 99; see *Britt*, *supra*, at p. 952.)

The evidence showed that Pytel picked up her cell phone, called 911, and told defendant that she was calling the police.  Defendant tried to grab the phone, knocking Pytel's arm into the wall and causing the phone to fall to the floor.  The two lunged for the phone but defendant reached the phone before Pytel, and he took the phone away with him.  The trial court believed the evidence showed two separate intents: defendant took the phone from Pytel to prevent her from calling the police, but then "he also took the phone and did not return the phone," evidencing a separate intent to permanently deprive Pytel of the phone.  The court believed separate punishment was justified because defendant's behavior "caused more damage than somebody who simply took the phone, prevented the victim from phoning the police, and, essentially, took the battery out of the phone, . . . turned the phone off or just kept the phone long enough where the victim wasn't able to use the phone to make that call."

From our review of the record, we do not find substantial evidence to support the conclusion that defendant's intent in taking Pytel's cell phone was anything other than to

10

prevent her from calling the police. The fact that defendant chose to take Pytel's cell phone and leave the area, instead of choosing to stay with his victims and deactivate the phone, does not establish that his theft of the phone was anything more than the quickest and most efficient way of ensuring that Pytel did not use her cell phone to contact the police. That the phone was not found in defendant's possession when he was arrested supports the conclusion defendant's "objective was to take [Pytel's] cell phone so that [Pytel] could not use it to contact law enforcement." (*People v. Galvez* (2011) 195 Cal.App.4th 1253, 1263.) Accordingly, defendant's sentence for dissuasion of a witness must be stayed under section 654. (*Id*. at p. 1264.)[6]

## DISPOSITION

The judgment is modified to stay the sentence on count 4 for dissuading a witness under section 654. As so modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.

GARNETT, J.[*]

We concur:

ZELON, Acting P. J.                    SEGAL, J.

---

[6]      The trial court's modification of defendant's sentence to run defendant's 16-month sentence for dissuading a witness concurrent, rather than consecutive, to the robbery does not change our conclusion because the concurrent sentence is still punishment and "is treated as an implied finding that the defendant bore multiple intents or objectives . . . ." (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1468.)

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11