[No. F043976. Fifth Dist. Dec. 16, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
CLAUDE ADAMS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION<sup>*</sup>]**

---

<sup>*</sup>Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

## Counsel

Betsy S. Kimball, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, and Wanda Hill Rouzan, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**GOMES, J.**—Claude fought the dog and the dog won. A jury convicted Claude Adams of misdemeanor battery on a police dog (Pen. Code, § 600, subd. (a), (count 3)) along with possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a) (count 1)), and misdemeanor resisting arrest (Pen. Code, § 148 (count 2)).[1]

On appeal, Adams challenges only his conviction for battery on a police dog. Adams contends his conviction on this count must be reversed because (1) the court refused defense counsel's request to instruct the jury on the definition of the term "maliciously," (2) the court failed to instruct the jury sua sponte on the definition of the term "without legal justification," and (3) the court failed to provide the jury with a written instruction on the elements of Penal Code section 600, subdivision (a),[2] as the jury requested. We will affirm.

### FACTS

On May 10, 2003, around 11:13 p.m., Bakersfield Police Officer Damon Youngblood was working routine patrol in a marked unit with his K-9. Upon seeing Adams walking with an unidentified Hispanic male in an area known for high narcotics usage, Officer Youngblood decided to contact Adams. Adams appeared nervous; he was sweating and displaying symptoms consistent with being under the influence of a central nervous system stimulant. When Officer Youngblood asked Adams if he minded being searched, Adams told him to go ahead. Officer Youngblood found a large sum of money in Adams's rear pocket, which he removed and placed on his patrol car.

---

[1] Adams admitted he suffered two prior convictions within the meaning of Penal Code section 667.5, subdivision (b). Adams was sentenced to a total term in state prison of four years comprised of two years for count 1, and two 1-year enhancements for the prior prison terms. On the remaining two counts, Adams was sentenced to 180 days for each count, to be served concurrently with count 1.

[2] All further statutory references are to the Penal Code.

Continuing the search, Officer Youngblood felt something squishy with hard objects inside it in Adams's left front pocket, which Officer Youngblood thought was possibly rock cocaine. Officer Youngblood pulled the object out and saw a clear plastic baggie containing eight to 10 white rocks he believed were rock cocaine.

Adams became "antsy." Officer Youngblood pushed the baggie back into Adams's pocket so he could gain better control of Adams and placed Adams in a reverse wrist lock. He told Adams he was under arrest. Adams took his free hand down from the back of his head and refused Officer Youngblood's orders to put it back. When Officer Youngblood attempted to push Adams to the ground, Adams managed to break free and run away across a parking lot. Officer Youngblood chased him on foot. Despite Officer Youngblood's repeated orders to stop, Adams continued to run. Finally, for safety reasons, Officer Youngblood stopped chasing Adams and set up a perimeter. Area officers responded as backup.

Bakersfield Police Officer Chris Ward and his K-9, Hunter, responded to the call for backup. Upon arrival at the scene, Officers Ward and Hunter took a perimeter position. About 30 minutes later, Officers Ward and Hunter, along with another officer, began searching house to house. Hunter led the officers into the yard of a residence. The house had a stairway up to a porch and a crawl space under the house. Officer Ward found the access to the crawl space after Hunter pulled him toward a bush. Hunter tried to enter the access, but Officer Ward pulled him back. Officer Ward then called Officer Youngblood to the house.

Officer Ward looked into the crawl space, but did not see anyone. He then yelled into the crawl space two or three times that he was with the Bakersfield Police Department and anyone there should come out with his hands up or he was going to send in the police dog. Officer Ward had Hunter bark several times between announcements, then listened each time to see if he could hear anything. When there was no response, Officer Ward deployed Hunter to check the crawl space.

The officers immediately heard barking, followed by yelling and profanities. Within seconds, Officer Ward entered the crawl space with Officer Youngblood following. They could see Adams sitting up and hitting Hunter on the head with a stick that looked like a portion of a table leg, while Hunter held fast to his lower left leg. Officer Ward yelled at Adams to put the stick down, but he continued hitting Hunter. Adams hit Hunter on the head another five to eight times before finally throwing down the stick. At that point, Officer Ward called Hunter back to him and took Hunter out.

Officer Youngblood ordered Adams to come out from under the house, which he eventually did. Officer Youngblood handcuffed Adams and placed him under arrest. A subsequent search revealed that the plastic baggie was no longer in Adams's pocket. Officer Youngblood did find a $10 bill wrapped around a white rock, which appeared to be rock cocaine, in Adams's left front pocket.[3] In addition, Adams was missing the T-shirt he had been wearing when Officer Youngblood initially contacted him. Approximately 45 minutes had transpired between Officer Youngblood's initial contact with Adams and his arrest. Although officers searched for the plastic bag, they were unable to find it.

Adams was transported to Kern Medical Center, where he was treated for his injuries, which included punctures on his left lower leg and foot. Hunter received a laceration on the side of his nose, but Officer Ward did not take him to the veterinarian. According to Officer Ward, Hunter properly performed his duties in accordance with his training.

*Defense*

Adams testified in his own defense. According to Adams, on the night of May 10, 2003, about 11:15 p.m., he was walking with an acquaintance in the vicinity of Baker Street. Officer Youngblood came around the corner in his patrol car, jumped out, and asked Adams whether he had anything on him. When Adams said no, Officer Youngblood asked if he could search him. Adams asked why. Officer Youngblood then grabbed him by his arm like he was trying to break it. Adams became "real scared," broke free and ran. While Adams admitted having a single rock of cocaine on him at the time, he denied having a plastic bag containing rocks of cocaine. Adams also admitted he fled across a parking lot and over fences and that he hid under a house.

After he had been under the house for 20 to 30 minutes, Officers Ward and Youngblood arrived with a leashed dog. Adams claimed he never heard the officers telling him to come out or heard the dog bark. Adams testified the officers were "sneakin' up" on him, but after he saw "the light," he turned around and saw them. The officers had crawled into the crawl space together with the dog still on the leash.

According to Adams, when the officers saw him, they told him to be still and not move. Adams complied. Officer Youngblood grabbed him by his feet and held him. Adams said Officer Youngblood "hurr[ied] up [and] took my shoe off and throw it, then he take off my T-shirt I had on." Adams further explained that initially the dog only had him by the pants "a bit," and the

---

[3] Laboratory analysis later confirmed the rock contained cocaine.

officer made the dog stop. Then Officer Youngblood grabbed his leg and held him down, took off his shoes, and told the dog, "get 'em boy, get 'em boy, bite 'em, bite 'em." Adams begged the officers to make the dog stop and told them he gave up, but the officers only responded with nasty remarks and thought it was funny. One of the officers said they would only call the dog off if Adams stuck out his hand. When Adams did this, the officers "got the dog [to] bit[e] my arm." The officers held him where they wanted the dog to bite him and told the dog to "get 'em, get 'em boy, that keep 'em from running, get 'em." He claimed Officer Youngblood tore his pants leg, and the officers told the dog to bite him on the arm and back. While these events were occurring, Officer Ward was laughing and "getting his kick[s]." The officers told Adams to crawl on his belly and, if he did not hurry up, they would make the dog bite him some more.

Adams said the officers grabbed his arms and tried to twist him over and drive him out from under the house. They also grabbed his neck and twisted and slammed him "real hard." Even after he was taken to the hospital, Officer Ward continued to make jokes. Adams claimed he never saw the stick before and never picked it up, that he never hit the dog with a stick and that he never kicked the dog.

## DISCUSSION

### I. *"Maliciously" and "Legal Justification" as Used in Section 600*

The trial court instructed the jury with a specially drafted instruction which stated that in order to convict Adams of a violation of section 600, the jury had to find among other things that he "willfully and maliciously and with no legal justification" struck, beat, kicked, cut or stabbed a dog under the supervision of a peace officer.[4] While the court instructed the jury with the

---

[4] The entire instruction on section 600, as first read to the jury, was: "The defendant is accused in count 3 of having committed the crime of injuring a dog used by peace officers, commonly referred to as battery on a police dog, or, as we've referred to it in the verdict form, willfully harming a police dog. [¶] In any event, he's charged with a violation of Penal Code Section 600, a misdemeanor. [¶] That provides that any person who willfully and maliciously, and with no legal justification, strikes, beats, kicks, cuts and/or stabs any dog under the supervision of any peace officer in the discharge or attempted discharge of his duties, is guilty of a violation of Penal Code Section 600, a misdemeanor. [¶] In order to prove this crime, each of the following four elements must be proved: [¶] One, a person willfully and maliciously and with no legal justification, strikes, beats, kicks, cuts and/or stabs a dog under the supervision of a peace officer. [¶] Number two, the person acted in such manner as to be capable of producing injury and likely to produce injury to such dog. [¶] Three, the dog was under the supervision of any peace officer engaged in the discharge or attempted discharge of his duties. [¶] And, four, the person knew or reasonably should have known that the dog was under the supervision of a peace officer and was engaged in the performance of his duties."

definition of "willfully" contained in CALJIC No. 1.20,[5] the court refused defense counsel's request to instruct the jury on the definition of "maliciously" as set forth in CALJIC No. 1.22.[6] The court also did not give any specific instruction on the definition of "with no legal justification," and defense counsel did not request such an instruction.

■ Adams first contends the trial court erred by refusing his trial counsel's request to define the word "maliciously" as used in section 600, subdivision (a). He claims the error is analogous to failure to instruct on an element of an offense, which denied him due process of law and a fair trial. (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1313 [18 Cal.Rptr.2d 796, 850 P.2d 1].) We disagree with Adams's analogy because the term "maliciously" as used in section 600, subdivision (a), does not have a technical meaning different from its common meaning.

■ " '[T]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language.' " (*People v. Estrada* (1995) 11 Cal.4th 568, 574 [46 Cal.Rptr.2d 586, 904 P.2d 1197].) However, the trial court has a sua sponte duty to give jurors explanatory instructions when a term in an instruction has "a technical meaning that is peculiar to the law." (*People v. Howard* (1988) 44 Cal.3d 375, 408 [243 Cal.Rptr. 842, 749 P.2d 279].) "The rule to be applied in determining whether the meaning of a statute is adequately conveyed by its express terms is well established. When a word or phrase ' "is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request." ' [Citations.] A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning. [Citation.]" (*People v. Estrada, supra,* 11 Cal.4th at p. 574.)

■ Adams claims the word "maliciously" has a technical legal meaning because it is specially defined in section 7, paragraph 4, and is the subject of a standard criminal jury instruction (CALJIC No. 1.22). "Maliciously" is

---

[5] The CALJIC No. 1.20 instruction given reads: "The word 'willfully' when applied to the intent with which an act is done or omitted means with a purpose or willingness to commit the act or to make the omission in question. The word 'willfully' does not require any intent to violate the law, or to injure another, or to acquire any advantage."

[6] The proposed CALJIC No. 1.22 instruction reads: "The words 'malice' and 'maliciously' mean a wish to vex, [defraud,] annoy or injure another person, or an intent to do a wrongful act." In refusing the instruction, the court explained it "did not feel it necessary to give it in the context of this particular case."

typically defined in legal proceedings to mean "a wish to vex, annoy, or injure another person, or an intent to do a wrongful act." (§ 7, par. 4.) This definition, however, does not entirely apply to the crime of battery on a police dog under section 600, subdivision (a). Section 600, subdivision (a) makes it an offense to "maliciously" strike, beat, kick, cut, stab, poison, throw an object at, or place an object likely to produce injury in the path of "any dog under the supervision of, any peace officer in the discharge or attempted discharge of his or her duties." The acts that constitute the crime are specific acts of cruelty which by their nature necessarily imply the use of malice in the second sense of the code definition, "an intent to do a wrongful act." (§ 7, par. 4, 2d cl.) The statute does not involve the first sense of the code definition which imports "a wish to vex, annoy, or injure another person." (§ 7, par. 4, 1st cl.) Therefore, the only definition of "maliciously" from section 7, paragraph 4, applicable to battery on a police dog is the second definition.[7]

■ "Malice" is defined in non-legal settings as the "desire to cause pain, injury, or distress to another" or the "intent to commit an unlawful act or cause harm without legal justification or excuse." (Merriam-Webster's Collegiate Dict. (1999) p. 704.) In the circumstances of this case, the common understanding of maliciously is no different than the applicable definition from the statute and CALJIC No. 1.22. Accordingly, no additional instruction beyond that of the statutory language was required.

Adams next contends the court was required to instruct the jury sua sponte with the definition of "legal justification." While the trial court did not define that term, Adams acknowledges the jury was instructed they should find Adams not guilty of battery on a police dog if (1) they had a reasonable doubt the officer was attempting to make a lawful arrest or using reasonable force in attempting to make the arrest, or (2) they found the officer used unreasonable or excessive force in attempting to make the arrest and Adams used only reasonable force to protect himself.[8] Adams argues, however, the court was required to "close the proverbial loop by telling the jury that self-

[7] This same conclusion was reached in the context of the cruelty to an animal statute contained in section 597 in *People v. Dunn* (1974) 39 Cal.App.3d 418 [114 Cal.Rptr. 164]. In that case, the court concluded that only the "intent to do a wrongful act" portion of section 7, paragraph 4, applied to the term "maliciously" contained in section 597, which makes it an offense to maliciously maim, wound, or kill the animal of another. (*People v. Dunn, supra,* 39 Cal.App.3d at pp. 420–421; § 597, subd. (a).)

[8] The jury was instructed with CALJIC No. 16.110 as follows: "In a prosecution for violation of Penal Code Section 148, resisting arrest, as well as a violation of Penal Code Section 600, the People have the burden of proving, beyond a reasonable doubt, that the peace officer was engaged in the performance of his duties. [¶] A peace officer is not engaged in the performance of his duties if he makes or attempts to make an unlawful arrest, or uses unreasonable or excessive force, in making or attempting to make the arrest. [¶] If you have a reasonable doubt that the peace officer was making or attempting to make a lawful arrest, or

defense against excessive force is what constituted 'legal justification' in the context of this case in which it was the prosecution's burden to prove the absence of legal justification as a separate element of the Penal Code section 600 offense."

█ We need not decide whether the court had a sua sponte duty to give such an instruction in this case, however, because any error in failing to so instruct was harmless since the jury necessarily resolved the issue against Adams through other properly given instructions. (*People v. Wooten* (1996) 44 Cal.App.4th 1834, 1849 [52 Cal.Rptr.2d 765] [" 'A failure to instruct where there is a duty to do so can be cured if it is shown that "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions" [Citation.]' [Citation.]"].) █ The instructions given informed the jury that in a prosecution under section 600, the People had the burden of proving beyond a reasonable doubt that the officers were engaged in the performance of their duties, that an officer is not engaged in the performance of his duties if he uses unreasonable or excessive force in attempting to make the arrest, and if the jury had a reasonable doubt the officers were using reasonable force, they should find Adams not guilty of battery on a police dog. They were further instructed they could not convict Adams of a violation of section 600 if they found an officer used unreasonable or excessive force and Adams used only reasonable force to protect himself.

Under these instructions, the jury was obligated to acquit Adams of battery on a police dog if it found the officers used excessive force and Adams used only reasonable force to protect himself. Thus, by convicting Adams of battery on a police dog, the jury necessarily resolved the issue of self-defense against excessive force against him. Accordingly, any error in failing to give an instruction on legal justification was necessarily harmless.

II. *Refusal to Provide Written Instruction on Section 600**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

using reasonable force in making or attempting to make the arrest, and thus have a reasonable doubt that the officer was engaged in the performance of his duties, you must find the defendant not guilty of the crimes of resisting arrest and battery on a police dog."

The jury was also instructed with CALJIC No. 16.111 as follows: "A peace officer is not permitted to use unreasonable or excessive force in making or attempting to make an otherwise lawful arrest. [¶] If an officer does use unreasonable or excessive force in making or attempting to make an arrest, the person being arrested may lawfully use reasonable force to protect himself. [¶] Thus, if you find that the officer used unreasonable or excessive force in making or attempting to make the arrest in question and that the defendant used only reasonable force to protect himself, the defendant is not guilty of the crime charged in either Count 2 or Count 3."

*See footnote, *ante*, page 1486.

## DISPOSITION

The judgment is affirmed.

Cornell, Acting P. J., and Dawson, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 16, 2005. Brown, J., did not participate therein.