Filed 1/17/23  P. v. Lechuga CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE, | D079398 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE395395) |
| RICHARD LECHUGA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia K. Cookson, Judge.  Affirmed in part, reversed in part, remanded with instructions.

Kenneth J. Vandevelde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

# I

## INTRODUCTION

Law enforcement officers encountered defendant Richard Lechuga walking in and out of traffic, acting abnormally, and making suicidal statements. They planned to detain him for a mental health assessment, evaluation, and treatment under Welfare and Institutions Code section 5150. Before they could do so, he reached for a nearby canister of bear spray, which triggered a tense standoff with law enforcement. During the standoff, he sprayed the canister of bear spray into the faces of three deputy sheriffs, slashed a police dog with a knife, and shot a pellet gun into the ceiling of his car. Law enforcement officers ultimately used pepper spray, a pepper ball gun, beanbag shotguns, and a taser to subdue and arrest the defendant.

After a trial, the defendant was found guilty of one count of exhibiting a deadly weapon to a peace officer to resist arrest (Pen. Code,[1] § 417.8; count 1); three counts of resisting an executive officer (§ 69, subd. (a); counts 2–4); one count of animal cruelty (§ 597, subd. (a); count 5); one misdemeanor count of brandishing an imitation firearm in a threatening manner (§ 417.4; count 7); and one misdemeanor count of harming a police dog (§ 600, subd. (a); count 8).[2] He also pleaded guilty to one misdemeanor count of possession of tear gas by a felon (§ 22810, subd. (a); count 9). True findings were made on allegations he used a deadly and dangerous weapon (a knife) in the commission of counts 1 and 5 (§ 1192.7, subd. (c)(23)); he

---

[1] Further undesignated statutory references are to the Penal Code.

[2] At the close of trial, the court dismissed an animal neglect charge and renumbered the remaining charges for purposes of the jury's verdict forms. The counts referenced herein reflect the charges as alleged in the operative charging instrument prior to the renumbering.

committed counts 1–5 while released from custody on bail (§ 12022.1, subd. (b)); and he personally used a deadly and dangerous weapon (a knife) in the commission of count 5 (§ 12022, subd. (b)(1)). The trial court sentenced the defendant to an aggregate term of six years in state prison.

On appeal, the defendant argues: (1) there was insufficient evidence to support his convictions for counts 2–5 and 7–8; (2) the trial court committed instructional error; (3) the court improperly imposed multiple punishments for a single act of slashing a police dog with a knife; and (4) the court violated his constitutional rights and state law by imposing a $10,000 restitution fine and a $10,000 stayed parole revocation restitution fine.

We agree with the defendant that the trial court erroneously imposed multiple punishments for a single act. Therefore, we vacate the sentence and remand the matter for a full resentencing proceeding. We do not address the defendant's arguments concerning the restitution fines, which may be presented to the trial court during resentencing. We reject the defendant's remaining arguments and affirm the judgment in all other respects.

## II

## BACKGROUND

"In light of the sufficiency of the evidence contentions that follow, we set forth the facts here in the light most favorable to the judgment." (*People v. Lee* (2011) 51 Cal.4th 620, 625, fn. 5.)

One morning, U.S. Border Patrol agent Charles Oakey was parked in his marked patrol vehicle on a street in a rural area of Jamul. A passing motorist notified him a man up the road was running in and out of traffic and saying strange things like he wanted to die.

Agent Oakey drove up the road and saw the defendant walking along the shoulder. The defendant was not wearing a shirt and he looked sweaty

and agitated.  Agent Oakey pulled up next to the defendant and asked how it was going, and the defendant replied, "man, I'm having a really shitty day." Agent Oakey offered to help and asked the defendant to meet him at a nearby street pullout where the defendant's car was parked.

At the street pullout, the defendant told agent Oakey he was on his way to a job interview, but his car broke down.  According to agent Oakey, the defendant also said, "something about a dead body on the side of the road somewhere."  The defendant was "real sweaty" and certain of his statements were nonsensical.

Agent Oakey noticed the defendant had a large canister in his waistband.  He asked about the canister and the defendant said it was pepper spray; in fact, it was bear spray.  Agent Oakey asked the defendant to "ditch" the canister in his car and the defendant complied.

The defendant asked for water and help getting his car running.  Agent Oakey retrieved water from his patrol vehicle for the defendant.  While he was there, he radioed dispatch and asked for the county sheriff's department to come out and conduct a welfare check on the defendant.  Agent Oakey returned to the defendant's car, gave the water to the defendant, and waited for the sheriff's deputies to arrive.  As he waited, a second U.S. Border Patrol agent parked his marked patrol vehicle and joined agent Oakey.

Soon after, deputy sheriff Bryan Paukovits arrived and took the lead role speaking with the defendant, who at this point was in the driver's seat of his car with the car door open.  Deputy Paukovits walked towards the car and asked, "How's it going, sir?"  The defendant said, "bad, I just need a [car battery] jump."  But then, as deputy Paukovits approached the car, the defendant slammed the driver-side door shut and blasted music from his phone speaker.  Speaking through the closed car door, deputy Paukovits

4

offered to jump the defendant's car battery and reassured the defendant several times he was not in trouble. He repeatedly asked the defendant to speak with him and open his car door or roll down his car window, but the defendant refused.

Unable to engage the defendant in conversation, deputy Paukovits returned to the patrol vehicles that were parked behind the defendant's car. The law enforcement team ran the license plates on the defendant's car and learned he had prior charges for domestic violence and resisting an executive officer. A few minutes later, a second deputy sheriff, corporal Mike Villalobos, arrived in a marked patrol vehicle.

In the interim, the defendant remained inside his car with the doors and windows closed, moving his head around and gesticulating his arms erratically. About six minutes after the defendant closed the driver-side door, he opened it back up again. Periodically, he yelled and screamed to himself, at one point screaming, "Oh my god," for no apparent reason.

Deputy Paukovits and corporal Villalobos walked to the defendant's car and deputy Paukovits engaged the defendant in conversation. Throughout the conversation, deputy Paukovits stood with his arm draped over the open driver-side door about two feet from the defendant, while corporal Villalobos stood a few feet behind deputy Paukovits.

Deputy Paukovits asked the defendant if he was okay and whether he needed help, to which the defendant replied, "I need a bullet between my eyes." Deputy Paukovits asked why he said that and the defendant screamed, "Because I've died so many times and I can't seem to fucking die, and it's a curse for everybody because I just keep on fucking coming back. Don't I? I'm sorry to disappoint you! I can't fucking die that easily!" Deputy Paukovits asked whether the defendant wanted to die and he replied, "Why

5

the fuck not? I lost everything. I don't have shit here." He said he had "nothing to live for" because Satanists "stole [his] baby and probably ate him." He said he had no money, no gas, and a dead car battery. He also screamed, "No girl wants me. Not a single girl in this fucking world wants me, bro."

Deputy Paukovits offered to get a tow for the defendant. The defendant said he could not afford one, but deputy Paukovits could help him by opening the hood to his car. Deputy Paukovits said he would "work on that," but first he wanted to make sure the defendant did not hurt himself or anybody else. The defendant replied, "I ain't hurting nobody, man. I've tried to hurt myself the whole entire—I crashed my car at 80 miles per hour, man, one time. Nothing fucking happened. ... I'm fed up because I'm, like, what the fuck am I fighting for. I just want to go with the sun and the stars. ... I'm done with this world, man."

The defendant broke down sobbing and said his baby's mother stole his baby and "corrupted the whole system." He screamed, "Nothing fucking matters ... I'm so tired. ... What do I have to lose now?" Then, presumably referring to his baby's mother, he said, "I never laid a hand on that bitch, man. I let her beat the living shit out of me because she's in a female's body. Because I'm a gentleman. I could have fucked her up. I could have killed her any second, but I didn't. I didn't and I regret it because she wanted me to kill her." At or about this time, a third sheriff's deputy, Darryl Patmon, arrived on the scene and approached the defendant's car from the passenger side.

Deputy Paukovits said he could not assist the defendant with his child, but he could help the defendant if he needed it. The defendant again stated he could help by popping the hood of his car. Deputy Paukovits asked whether he had done drugs that day and the defendant said he had smoked

weed eight hours earlier. While this exchange was going on, deputy Paukovits put on rubber gloves, anticipating he would soon detain the defendant for a mental health evaluation, or a "5150 hold."

Deputy Paukovits asked the defendant to speak with him outside the car and the defendant said, "No, brother. Fuck no. Please step, step back and help me open [the hood]—I already asked you for something." Deputy Paukovits said, "I'm not going to let you shut the door. Okay? Richard, come on and step—take a step out. Okay?" The defendant asked, "What's going on here," and deputy Paukovits said, "I'm going to get you help." By this point, deputy Paukovits had observed that the defendant had a screwdriver in his car's center console and a canister of bear spray wedged between the car wall and the driver's seat.

Events unfolded quickly from there. The defendant reached down towards the canister of bear spray. In response, deputy Paukovits reached into the car and tried to pin down the defendant's arm. The defendant screamed, "Oh my god, no. You won't do this to me again," and stood up. As he stood, he sprayed the canister, which released a chemical agent into the faces of all three deputies, burning their eyes and obscuring their vision.[3]

Deputy Paukovits pushed the defendant back into his car and agent Oakey sprayed him with oleoresin capsicum (OC) spray. However, the defendant was able to close the driver-side car door and climb into the

---

[3] The defendant disputes the sequence of events and claims deputy Paukovits advanced upon him before he reached for the bear spray. But, as we will discuss, there was substantial evidence the defendant reached towards the canister of bear spray first and, in fact, caused deputy Paukovits to reach towards him. Under the governing standard of appellate review, we presume the jury credited and relied on this evidence.

backseat. At this point, the deputies believed they had probable cause to arrest the defendant for assaulting peace officers.

Meanwhile, deputy Patmon ran to his patrol unit and retrieved his certified K-9 partner, Bono. He screamed "stop fighting" several times, warned he would send the dog, and commanded the defendant to put his hands on the ceiling. The defendant did not comply. About 30 seconds later, deputy Paukovits opened the rear passenger door of the defendant's car and deputy Patmon deployed Bono. Bono jumped into the car and bit the defendant's leg.

As Bono was jumping into the car, the defendant pulled out a 15-inch blade with a sharpened edge and a serrated back end. He slashed it across Bono's face, causing him to sustain a large gash near his eye and nose. Deputy Patmon recalled Bono while the defendant closed the rear passenger door and climbed back into the front seat.

Corporal Villalobos and other members of the law enforcement team repeatedly screamed at the defendant to drop his knife and exit the car, but he did not comply. Instead, he howled, asked what he did wrong, and screamed for water and help. Twice, he yelled at the officers to "put a bullet" in his head. Throughout this encounter, the defendant waived his knife around and the officers kept their service weapons trained on him.

About five minutes after deputy Patmon deployed Bono, corporal Villalobos approached the vehicle and sprayed the defendant with more OC spray through an open window. He intended to disorient the defendant, but the spray had minimal effect. A short time later, the defendant tried to crawl out of the car through the driver-side door while holding a large, indiscernible black object. Fearing for the safety of his partners, deputy Patmon shot the

defendant with a beanbag shotgun and struck him in the lower part of his back.

The defendant retreated back into his car and procured a pellet gun that resembled a lethal handgun. He yelled at the officers to shoot him and pointed the pellet gun at both himself and the roof of his car. He also fired the pellet gun two or three times into the roof. Based on the noise the gun produced, corporal Villalobos determined it was a pellet gun—not a lethal firearm. He notified the other officers accordingly.

Additional deputies arrived and trained both lethal weapons and non-lethal devices on the defendant. They repeatedly warned him to put down the knife and the gun, put his hands up, and exit the vehicle. The defendant did not comply. At that point, one of the deputies shot a beanbag shotgun at the defendant and struck him.

The defendant pointed his pellet gun at a deputy, prompting the law enforcement team to use multiple non-lethal and less-lethal devices on him. One deputy fired a beanbag shotgun at him, another deputy fired a pepper ball gun at him, and a third deputy tased him. Deputy Patmon dragged the disoriented defendant out of his car through a broken window and the law enforcement team detained him until paramedics arrived.

## III

## DISCUSSION

### A. *Substantial Evidence Supported the Defendant's Convictions*

The defendant challenges his convictions for resisting an executive officer, harming a police dog, animal cruelty, and brandishing an imitation firearm in a threatening manner, on grounds that there was insufficient evidence to support the convictions. We reject the defendant's sufficiency-of-

9

the-evidence challenges and conclude ample evidence supported each conviction.

### 1. *Standard of Review*

We apply the substantial evidence standard of review to assess the sufficiency of the evidence supporting a criminal conviction. (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.) " '[W]e review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime … beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*Ibid.*)

### 2. *Substantial Evidence Supported the Defendant's Convictions for Resisting an Executive Officer (Counts 2–4)*

The defendant was convicted of three counts of resisting an executive officer in violation of section 69, subdivision (a), for spraying deputy Paukovits, corporal Villalobos, and deputy Patmon with bear spray.

Section 69, subdivision (a) provides, in relevant part, that "[e]very person … who knowingly resists, by the use of force or violence, [an executive] officer, in the performance of his or her duty, is punishable by a fine … or by imprisonment … or by both such fine and imprisonment."[4]  An essential element of the offense of resisting an executive officer is that the officer was lawfully engaged in the performance of his or her duties at the time of the defendant's resistance.  (*People v. Murillo* (2021) 71 Cal.App.5th 1019, 1022–1023; *People v. Rasmussen* (2010) 189 Cal.App.4th 1411, 1418.)

The defendant contends there was insufficient evidence to prove the officers were lawfully engaged in the performance of their duties when he resisted them—i.e., when he sprayed them with bear spray.  He argues they did not act lawfully because they did not provide him with an advisement that must be given whenever an officer conducts an involuntary detention under Welfare and Institutions Code section 5150.

Welfare and Institutions Code section 5150 "allows law enforcement officers and various medical professionals to bring an individual to an appropriate facility for assessment, evaluation, and treatment for up to 72 hours where there is ' "probable cause to believe that the person is, as a result of mental disorder, a danger to others, or to himself or herself, or gravely disabled." ' " (*Julian v. Mission Community Hospital* (2017) 11 Cal.App.5th 360, 375.)  It requires the officer or medical professional to give an oral advisement to the person "at the time he or she is first taken into custody." (Welf. & Inst. Code, § 5150, subd. (g)(1).)  The advisement must include, in substantial form, the following information:  (1) the name of the

_____

[4]    A defendant can violate section 69, subdivision (a), in another way—by "attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law." (*In re Manuel G.* (1997) 16 Cal.4th 805, 814.)  However, the jury was not instructed on this theory of liability.

11

officer or medical professional and the agency with which he or she is associated; (2) the fact the person is "not under criminal arrest," but is being taken for an examination by mental health professionals; (3) the name of the facility where the examination will be conducted; and (4) the fact the person "will be told [his or her] rights by the mental health staff." (*Ibid.*)

It is undisputed the law enforcement officers in this case did not provide the defendant with an oral advisement substantially in the form set forth in Welfare and Institutions Code section 5150. Nonetheless, contrary to the defendant's claim, the officers' failure to give the oral advisement did not render their conduct unlawful. Critically, an oral advisement is only required "at the time [a person] is first taken into *custody*." (Welf. & Inst. Code, § 5150, subd. (g)(1), italics added.) Here, there was substantial evidence from which a rational jury could find that the defendant was not yet in custody at the time he reached for the canister of bear spray; therefore, the officers' duty to provide the defendant with an oral advisement had not yet arisen.

"Whether a person is in custody is an objective test; the pertinent question being whether the person was formally arrested or subject to a restraint on freedom of movement of the degree associated with a formal arrest." (*People v. Linton* (2013) 56 Cal.4th 1146, 1167 [defining custody in the context of warnings required by *Miranda v. Arizona* (1966) 384 U.S. 436]; see *California v. Beheler* (1983) 463 U.S. 1121, 1125 ["the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest"].) " '[C]ustody must be determined based on how a reasonable person in the [defendant's] situation would perceive his circumstances.' " (*Linton*, at p. 1167.)

At the time the defendant reached for the canister of bear spray, he was seated in his own vehicle—not in a law enforcement vehicle, jail, or

prison. He was not handcuffed or subject to physical restraint. None of the officers had informed him that he was under arrest. Nor had they even notified him that they intended to detain him in a mental health facility. Although deputy Paukovits had put on his gloves and tried to coax the defendant out of the car voluntarily in anticipation that he might soon detain the defendant for a mental health evaluation, neither he nor the other officers had effectuated that plan by the time the defendant reached towards the canister of bear spray, which he then used to spray the officers in the face. From this evidence, a rational jury could find that the defendant was not yet subject to a formal arrest or an analogous restraint on his freedom of movement. Thus, a rational jury could find that he was not in custody.

In his appellate briefs, the defendant argues the officers took him into custody, or at minimum were "in the process" of taking him into custody, by the time he reached for the canister of bear spray. He claims deputy Paukovits lunged towards him and tried to seize him before he reached for the bear spray—actions that, in the defendant's view, placed him in custody.

However, at trial, deputy Paukovits testified he only reached into the defendant's car "when [the defendant] was grabbing for the bear spray," and he responded affirmatively when he was asked whether the defendant's act of grabbing for the bear spray was the reason he reached into the car. Deputy Paukovits added, "When I told [the defendant] I wanted to get him some help, he started reaching down to manipulate [the canister] and that's when I went into the car." Footage of the incident recorded on deputy Paukovits' body worn camera was played for the jury as well. Under the applicable standard of appellate review, we evaluate the evidence in the light most favorable to the judgment and presume in support of the judgment the existence of every fact the jury could reasonably have deduced. Based on deputy Paukovits'

13

testimony, as well as the body worn camera footage, a jury could reasonably find the defendant reached for the bear spray first, thus triggering the regrettable chain of events that followed.

The defendant also claims the law enforcement officers were not lawfully engaged in the performance of their duties because they employed excessive force against him before he reached for the bear spray. (*People v. Sibrian* (2016) 3 Cal.App.5th 127, 133 ["An officer using excessive force is not acting lawfully."].) According to the defendant, the officers "physically seiz[ed] [him] and dragg[ed] him from the car" before he reached for the canister. However, as just discussed, substantial evidence disproves the defendant's proffered chronology of events. In other words, substantial evidence proved the defendant reached for the bear spray first.

Further, the appellate record does not show that the officers exerted excessive force in any other way. "The use of excessive force by law enforcement officers is analyzed under the Fourth Amendment's objective reasonableness requirement for a seizure of the person." (*People v. Brown* (2016) 245 Cal.App.4th 140, 158, citing *Graham v. Connor* (1989) 490 U.S. 386.) "Under *Graham*, ... the question .. is whether the amount of force the officers used in making the arrest was objectively unreasonable given the circumstances they faced." (*Allgoewer v. City of Tracy* (2012) 207 Cal.App.4th 755, 763.) Careful attention must be paid "to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." (*Graham*, at p. 396.) "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (*Ibid*.)

14

It is undisputed deputy Paukovits grabbed and tried to pin down the defendant's arm. Viewing the evidence in the light most favorable to the judgment, we conclude his conduct was reasonable. The defendant had prior charges for domestic violence and resisting an executive officer. Body worn camera footage showed him acting in a manic, unpredictable, and non-compliant manner. It depicted him making suicidal and violent statements— including statements he "need[ed] a bullet between [his] eyes," he had "nothing to live for," he was "done with this world," and he regretted not killing his baby's mother. Moreover, as just discussed, deputy Paukovits testified he grabbed the defendant's arm only *after* the defendant reached for a weapon—i.e., the canister of bear spray. All of this evidence suggested the defendant posed a substantial and immediate danger of bodily harm to himself and the law enforcement team. Given these facts and circumstances, a reasonable jury could find deputy Paukovits's conduct was a reasonable exertion of force intended to ensure the safety of himself and others.

### 3. *Substantial Evidence Supported the Defendant's Misdemeanor Conviction for Harming a Police Animal (Count 8)*

The defendant was convicted of harming a police dog in violation of section 600, subdivision (a), for slashing Bono the K-9 unit with a knife. Section 600, subdivision (a), provides in relevant part, "Any person who willfully and maliciously and with no legal justification … cuts[] [or] stabs[] … a dog under the supervision of[] a peace officer in the discharge or attempted discharge of his or her duties[] … is guilty of a public offense."

The defendant argues there was insufficient evidence to support his conviction for harming a police dog because deputy Patmon was not lawfully discharging his duties at the time he slashed Bono. He asserts deputy Patmon used excessive force by deploying Bono and commanding him to bite. We are not persuaded.

15

As just discussed, the defendant exhibited manic behaviors and made violent and suicidal statements throughout his encounter with the law enforcement team, including while deputy Patmon was present. Then, he assaulted three members of the sheriff's department with a dangerous chemical agent, which—in the words of deputy Paukovits—"burn[ed] and pretty much … weld[ed]" the officers' eyes shut. In the aftermath of this assault, deputy Patmon warned the defendant several times to stop fighting, instructed him to put his hands up on the car ceiling, announced he had a "sheriff's department canine," and cautioned he would "send the dog." The defendant did not comply with these warnings or submit to arrest.

Under these circumstances, a rational jury could find deputy Patmon's deployment of Bono was reasonable. As deputy Patmon testified, he deployed Bono because the defendant had just assaulted three members of the law enforcement team and he was not complying with commands. Thus, he posed an ongoing threat to the safety of the law enforcement team, as well as passing motorists. Further, as deputy Patmon explained, there was a possibility the defendant could "drive away" and try to escape.[5] According to deputy Patmon, they therefore needed a "less lethal option" to "get him out of the car" and submit to arrest; hence, he deployed Bono. In light of the defendant's violent and assaultive behavior, his non-compliance, his risk of flight, and the continuing threat of harm he posed, a rational jury could find

---

[5]     The defendant argues he presented no flight risk because he told the deputies his car was broken down. However, at the time of the incident, a reasonable officer could have disbelieved the defendant, who had made numerous fantastical and nonsensical statements during his encounter with law enforcement. Further, the defendant was stationed inside the car throughout the encounter, which prevented the deputies from independently verifying that his car was in fact non-operational.

16

deputy Patmon's deployment of Bono was not excessive. Therefore, it could find he acted reasonably and lawfully in the discharge of his duties.

Next, the defendant claims substantial evidence did not prove he acted without legal justification—one of the requirements to sustain a conviction under section 600, subdivision (a). He argues he engaged in lawful self-defense by slashing Bono with a knife, and substantial evidence did not show otherwise. Once again, we disagree.

A rational jury could find the defendant was the initial aggressor when he preemptively reached for the canister of bear spray, which he then used to debilitate three officers. Further, as noted, a rational jury could find the officers exerted reasonable force. Because a jury could reach both of these findings, it could likewise find the defendant did not act in lawful self-defense when he slashed Bono instead of submitting to arrest. (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1 (*Christian S.*) ["It is well established that the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified."]; § 834a ["If a person has knowledge, or by the exercise of reasonable care, should have knowledge, that he is being arrested by a peace officer, it is the duty of such person to refrain from using force or any weapon to resist such arrest."].)

Finally, the defendant argues the conviction must be reversed because substantial evidence did not prove he acted "maliciously." For purposes of section 600, subdivision (a), a defendant acts "maliciously" when he or she harbors " 'an intent to do a wrongful act.' " (*People v. Adams* (2004) 124 Cal.App.4th 1486, 1494 (*Adams*); see also *id.* at pp. 1493–1494 [noting "the

17

term 'maliciously' as used in section 600, subdivision (a), does not have a technical meaning different from its common meaning," and defining " '[m]alice' … in non-legal settings as the 'desire to cause pain, injury, or distress to another' or the 'intent to commit an unlawful act or cause harm without legal justification or excuse' "].)

As noted, there was substantial evidence from which a rational jury could find the defendant was the initial aggressor, the members of the law enforcement team used reasonable force, and the defendant did not act in lawful self-defense. Thus, a rational jury could find the defendant harbored an intent to do a wrongful act when he slashed Bono with a knife.

4. *Substantial Evidence Supported the Defendant's Animal Cruelty Conviction (Count 5)*

The jury also found the defendant guilty of animal cruelty in violation of section 597, subdivision (a), for slashing Bono with a knife. Section 597, subdivision (a) proscribes animal cruelty in the following terms: "Except as [otherwise] provided … every person who maliciously and intentionally maims, mutilates, tortures, or wounds a living animal, or maliciously and intentionally kills an animal, is guilty of a crime."

The defendant claims there was insufficient evidence to support his animal cruelty conviction because substantial evidence did not prove he acted maliciously. Like the word "maliciously" in section 600, subdivision (a), the word "maliciously" in section 597, subdivision (a), means an intent to do a wrongful act. (*People v. Dunn* (1974) 39 Cal.App.3d 418, 420–421; see *Adams, supra*, 124 Cal.App.4th at p. 1494, fn. 7.)

In our discussion of the sufficiency of the evidence underpinning the harming a police dog conviction, we concluded there was substantial evidence to support a finding that the defendant acted maliciously when he slashed Bono with a knife. That conclusion applies equally here. Because there was

substantial evidence the defendant acted maliciously, his sufficiency-of-the-evidence challenge fails with respect to the animal cruelty conviction.

     5. *Substantial Evidence Supported the Defendant's Conviction for Brandishing an Imitation Firearm (Count 7)*

The defendant was found guilty of one misdemeanor count of brandishing an imitation firearm in a threatening manner in violation of section 417.4. Section 417.4 provides, "Every person who, except in self-defense, draws or exhibits an imitation firearm … in a threatening manner against another in such a way as to cause a reasonable person apprehension or fear of bodily harm is guilty of a misdemeanor punishable by imprisonment in a county jail for a term of not less than 30 days."

The defendant argues the brandishing conviction must be reversed because there was insufficient evidence to establish that he was not acting in self-defense when he exhibited the pellet gun. This argument is without merit as well.

As we have previously discussed, there was substantial evidence in the record from which a rational jury could find that the defendant was the initial aggressor and, furthermore, that the law enforcement team used reasonable force in response to the defendant's aggression—both when deputy Paukovits grabbed the defendant's arm and when deputy Patmon deployed Bono. On this basis, there was substantial evidence from which a jury could find the defendant did not act in lawful self-defense when he brandished his pellet gun. (*Christian S., supra*, 7 Cal.4th at p. 773, fn. 1.)

Additionally, substantial evidence supported a finding that the defendant did not reasonably believe he must resort to an immediate use of force to defend himself against an imminent danger of bodily injury. (*People v. Clark* (2011) 201 Cal.App.4th 235, 250 (*Clark*).) Before the defendant brandished his pellet gun, the officers told him—over and over again—they

19

were there to help.  Time and again, they told him to exit his car and drop his knife.  At one point, an officer said, "Nobody wants to shoot you, Richard.  We just need to get you some help."  Soon after, the defendant begged the officers to "put a bullet in [his] head," and two of the officers unequivocally responded, "No."  One officer added, "Nobody wants to do that."

We are mindful the defendant pulled the pellet gun out while he and the law enforcement team were engaged in a highly-charged standoff, one in which the defendant had already suffered injuries.  But the law enforcement team's statements reflect a concerted effort to diffuse the tense situation. The officers repeatedly conveyed they did not wish to "put a bullet" in the defendant, and they announced the steps he should take to surrender.

Viewing this evidence in the light most favorable to the judgment, we conclude a jury could rationally find that the defendant did not reasonably believe an immediate use of force was necessary to defend himself against an imminent danger of serious bodily injury.  Because a rational jury could reach this conclusion, it could likewise reach a finding that the defendant did not act in lawful self-defense when he brandished his pellet gun.

B. *The Defendant has not Established Prejudicial Instructional Error*

Next, the defendant claims the trial court had a duty to instruct the jury, sua sponte, on the affirmative defense of self-defense for each charge.

A trial court must instruct the jury, sua sponte, on defenses relied on by the defense or defenses that are supported by substantial evidence and not inconsistent with the defense's theory of the case. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1224.)  "Substantial evidence supporting sua sponte instruction on a particular defense is evidence that is 'sufficient to "deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable [persons] could have concluded' " ' that the particular facts underlying the instruction did exist." (*People v. Brooks* (2017) 3 Cal.5th 1, 75.)

20

The trial court committed no instructional error with respect to count 7 (brandishing an imitation firearm) or count 8 (harming a police dog), because it gave a standalone self-defense instruction for both counts. It instructed the jury with CALCRIM No. 3470, which provided, "Self-defense is a defense to Counts 7 and 8. The defendant is not guilty of those crimes if he used force against the other person in lawful self-defense." The instruction then identified the requirements for lawful self-defense and stated, "The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense in Counts 7 and 8. If the People have not met this burden, you must find the defendant not guilty of those crimes."[6] Given the court's self-defense instruction, the defendant's instructional error argument fails for both of these counts.[7]

For the remaining counts, we do not decide whether there was instructional error because the asserted error was harmless under any standard of prejudice. With respect to counts 2–4 (resisting an executive officer), the court instructed the jury with CALCRIM No. 2670, which stated, "The People have the burden of proving beyond a reasonable doubt that [the deputies] were lawfully performing their duties as a peace officer when the

---

[6] Additionally, for count 7, the court gave CALCRIM No. 985, which stated, "To prove that the defendant is guilty of this crime, the People must prove that … [¶] … [¶] … When the defendant drew or exhibited the imitation firearm, he was not acting in self-defense." And, for count 8, it instructed the jury that "[t]he People must prove beyond a reasonable doubt that the peace officer was lawfully performing their duty and that the defendant was not acting in lawful self-defense at the time the defendant acted."

[7] To the extent the defendant argues the self-defense instruction was incomplete or in need of clarification, the defendant forfeited his argument by failing to request any additional or clarifying language in the trial court. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 876–877.)

21

defendant acted. … [¶] A peace officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone or using unreasonable or excessive force when making or attempting to make an otherwise lawful arrest or detention. [¶] … [¶] If a peace officer uses unreasonable or excessive force while arresting or attempting to arrest or detaining or attempting to detain a person, that person may lawfully use reasonable force to defend himself or herself."

When the jury convicted the defendant of all three counts of resisting an executive officer, it necessarily found the officers were lawfully performing their duties when the defendant resisted them and, further, the defendant did not use reasonable force to defend himself against excessive or unreasonable force. Given these findings, the court's asserted failure to provide a self-defense instruction was harmless error, to the extent it was error at all. (*People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1039 [alleged error in failing to provide transferred self-defense instruction was harmless because the jury's verdicts showed it "necessarily rejected the theory that appellant had inadvertently shot [the victim] in self-defense"].)

The jury's verdicts also foreclose a finding of prejudice in connection with the claim of instructional error for count 5. As noted, the trial court provided a self-defense instruction for count 8 (harming a police dog), and the jury found the defendant guilty of the charged crime. When the jury convicted the defendant of count 8, it necessarily found that the officers lawfully performed their duties while deploying Bono, and it also rejected the defendant's claim that he acted in self-defense by slashing Bono with a knife. As we will discuss below, the jury convicted the defendant of count 5 (animal cruelty) for the same conduct giving rise to count 8. Given that the jury decided the defendant did not act in lawful self-defense when he slashed

22

Bono, the defendant suffered no prejudice from the court's asserted failure to provide a self-defense instruction for count 5. (*Clark, supra*, 201 Cal.App.4th at p. 251 [where self-defense instruction was provided for one charge and a second charge was based on the same conduct, the alleged failure to provide self-defense instruction for second charge was harmless error].)

Finally, the alleged instructional error was harmless in connection with count 1 (exhibiting a deadly weapon to an officer to resist arrest). The defendant claims there was substantial evidence to support a sua sponte self-defense instruction for count 1 because he exhibited his knife in response to two examples of excessive force—(1) the deputies' alleged efforts to seize him at the beginning of the scuffle; and (2) deputy Patmon's deployment of Bono.

However, as just noted, the guilty verdicts on counts 2–4 showed that the jury necessarily rejected the defendant's argument that the deputy sheriffs exerted excessive and unreasonable force when they allegedly tried to seize him from his car. Likewise, the guilty verdict on count 8 meant the jury rejected the defendant's assertion that deputy Patmon exerted excessive force by deploying Bono. Because these verdicts show that the jury rejected both of the defendant's claims of excessive force, it surely would have rejected his self-defense argument in connection with count 1 as well.

C. *The Court Erred by Imposing Multiple Punishments for a Single Act*

The jury found the defendant guilty of animal cruelty (count 5) and harming a police dog (count 8). For the animal cruelty conviction, the court sentenced the defendant to the mid-term of two years in prison, plus one year consecutive and one year concurrent for the attached weapons

enhancements.[8] For the harming a police dog misdemeanor conviction, the court sentenced him to 364 days with credit for time served.

The defendant asserts the court violated section 654 when it imposed these sentences because it subjected him to multiple punishments for a single act—that is, his single act of slashing Bono with a knife. At the time the defendant was sentenced, section 654 provided in relevant part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Former § 654, subd. (a).)

The People describe this as a "close issue." However, they ultimately concede "both crimes were completed by a single physical act toward a single victim (i.e., the first use of the knife against Bono the dog)." We accept the People's well-taken concession. In accordance with the laws in effect at the time, the trial court should have imposed the sentence for the conviction carrying the longest potential term of imprisonment (the animal cruelty conviction) and stayed execution of sentence for the other conviction (the conviction for harming a police dog). (*People v. Reed* (2006) 38 Cal.4th 1224, 1227 ["When … section 654 prohibits multiple punishment, the trial court must stay execution of sentence on the convictions for which multiple punishment is prohibited."].) By failing to do so, the court erred.

After the defendant was sentenced, the Legislature enacted Assembly Bill No. 518, which amended Penal Code section 654, effective January 1, 2022. In relevant part, section 654 now states: "An act or omission that is punishable in different ways by different provisions of law may be punished

---

[8] The court struck the on-bail enhancement for sentencing purposes for all of the counts to which it applied, including the animal cruelty conviction.

under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) "Previously, where … section 654 applied, the sentencing court was required to impose the sentence that 'provides for the longest potential term of imprisonment' and stay execution of the other term. [Citation.] As amended by Assembly Bill [No.] 518 … section 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379 (*Mani*).)

We asked the parties to submit supplemental letter briefs concerning whether Assembly Bill No. 518 applies to the defendant's case. They filed briefs agreeing Assembly Bill No. 518 applies retroactively to the defendant's case because his judgment is not final and the legislation constituted an ameliorative change to the criminal law. We agree with the parties and conclude Assembly Bill No. 518 applies retroactively to the defendant's case. (*People v. Jones* (2022) 79 Cal.App.5th 37, 46 (*Jones*) [Assembly Bill No. 518 was an ameliorative change to the law that applies retroactively to nonfinal judgments]; *Mani, supra*, 74 Cal.App.5th at p. 379 [same].)

Although the People concede Assembly Bill No. 518 applies retroactively to the defendant's case, they argue it would be "futile" to remand the matter for resentencing. According to the People, there is "no possibility" the trial court would exercise its discretion under section 654 and reduce the defendant's sentence, given that it ostensibly could have imposed a lower sentence when it initially sentenced the defendant—for example, by selecting the lower term for convictions, running terms concurrently, or dismissing weapons enhancements altogether—yet it did not do so.

"Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that 'informed discretion' than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record." (*People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8.) In such circumstances, the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." (*Ibid*.; see also *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

Here, the record does not clearly indicate the trial court would impose the same sentence if it knew it had discretion to impose a lower one. When the court sentenced the defendant, it did not impose the maximum sentence or make statements suggesting the defendant should be incarcerated for the longest possible term. The court did not accept the recommendations of the probation department or the district attorney to impose a nine-year prison term, instead opting to impose a more lenient sentence of six years. Further, when the court imposed the middle term for count 5, rather than the upper term recommended by the probation department and the district attorney, it opined, "the injuries were not egregious to the animal." For all these reasons, we cannot say it would be a futile or idle act to remand the matter for resentencing.

We offer no opinion on how the trial court should exercise its discretion under section 654 during the resentencing proceeding. However, we note that the court, during resentencing, may reconsider any other components of the aggregate sentence in light of changed circumstances. (*Jones, supra*, 79 Cal.App.5th at p. 46; see also *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

D. *The Parties May Present their Arguments Concerning the Restitution Fine and the Stayed Parole Revocation Restitution Fine on Remand*

The trial court imposed a $10,000 restitution fine on the defendant under section 1202.4, subdivision (b), and it imposed, but stayed, a $10,000 parole revocation restitution fine under section 1202.45.

The defendant claims he lacks the ability to pay these fines. Based largely on his alleged inability to pay, the defendant argues the court's imposition of the fines violates the excessive fines clauses of the federal and state constitutions (U.S. Const., 8th Amend.; Cal. Const., art. 1, § 17), impinges upon his due process rights under the federal and state constitutions (U.S. Const., 14th Amend.; Cal. Const., art. 1, § 7), and constitutes an abuse of discretion under state law (§ 1202.4, subd. (d)).

Because we are vacating the sentence and remanding the matter for resentencing purposes, we do not address the defendant's contentions concerning the fines at issue. The parties may present their arguments concerning the fines to the trial court on remand.

## IV

## DISPOSITION

The sentence is vacated and the matter is remanded for the trial court to resentence the defendant. In all other respects, the judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

DATO, J.

27